### JOLIET CONTRACTORS ASS'N et al. v. NATIONAL LABOR RELATIONS BOARD.

No. 10667.

United States Court of Appeals, Seventh Circuit.

Feb. 10, 1953.

Rehearing Denied April 13, 1953.

Charles M. Price, Harold D. Burgess and Charles B. Mahin, Chicago, Ill. (MacLeish, Spray, Price & Underwood, Chicago, Ill., of counsel), for petitioner.

David P. Findling, Assoc. Gen. Counsel, A. Norman Somers, Asst. Gen. Counsel, Norton J. Come, Washington, D. C., Alice Andrews, Washington, D. C., for respondent.

Lester Asher and Daniel D. Carmell, Chicago, Ill., Asher, Gubbins & Segall, Chicago, Ill., for intervenor.

Before MAJOR, Chief Judge, and DUFFY and FINNEGAN, Circuit Judges.

MAJOR, Chief Judge.

Petitioners seek a review, pursuant to Sec. 10(f) of the National Labor Relations Act as amended, 61 Stat. 136, 29 U.S.C.A. § 151 et seq., of an order of the National Labor Relations Board insofar as it dismisses portions of a complaint charging Glaziers' Union, Local 27 of the Brotherhood of Painters, Decorators and Paper Hangers of America (hereinafter referred to as the Union), and its agents, George H. Meyers (now deceased) and John R. Hoffman, with violations of Sec. 8(b) (4) (A) of the Act. Previously, the Board had dismissed the complaint on the ground that the activities involved did not have a sufficient impact on commerce to justify the Board in exercising jurisdiction. On petition to review, this court set aside such order and remanded the case to the Board "for such further proceedings as may, under the Act, be appropriate." Joliet Contractors Ass'n v. National Labor Relations Board, 7 Cir., 193 F.2d 833, 844.

As shown in our previous opinion, the Board, pursuant to Sec. 10(l) of the Act, after a hearing in the United States District Court for the Northern District of Illinois, obtained an injunction against the Union restraining the alleged unfair labor practices pending final adjudication. The testimony heard in the court proceeding was, by stipulation, utilized by the Trial Examiner and the Board in deciding the case on its merits. Subsequent to our previous decision, no further report was made by the Trial Examiner and no additional testimony was heard by the Board. We think it may be safely asserted that no serious controversy exists as to the facts which are set forth in some detail on the first five pages of our previous opinion and no good purpose could be served in their repetition other than as they may bear upon certain matters to be subsequently discussed. In this court the Union was permitted to intervene, filed its brief and participated in the oral argument.

At this point, it is sufficient to note that the gravamen of the petitioners' contention is that the Union and its agents engaged in a comprehensive boycott campaign to eliminate the use of preglazed building materials in the Joliet construction area and that its entire course of conduct from the time it initiated such campaign in January 1948 until restrained by the United States District Court in November 1948 was directed to the accomplishment of this boycott objective. It is contended that pursuant to such objective the Union employed many coercive tactics and means, such as its announced ban against the use of preglazed sash, by its by-laws and working rules which prohibited work on jobs or for contractors using preglazed sash, by its refusal to assign or permit glaziers to work on jobs which the Union designated as "unfair" and that it caused work stoppages and work refusals by glaziers where the contractors on jobs were "unfair." And it is argued,

contrary to the decision of the Board, that each of these activities, being component parts of an over-all objective, constitutes a violation *per se*.

In view of the conclusion which we have reached, it would be futile to devote any great amount of effort to this phase of the controversy. This is so notwithstanding the record discloses beyond doubt that the objective of the Union and its agents was to prohibit the use of preglazed sash in the Joliet area and that a carefully devised plan was formulated for the purpose of accomplishing that result. The Union's by-laws and working rules, its announcement of unfair lists of contractors and material dealers who refused to comply with the Union requirement, and its refusal to furnish glaziers to those on the unfair lists, were all elements of a grandiose plan to accomplish the Union's objective.

 Even so, the conduct and activities of the Union, including those which we have mentioned, do not constitute an unfair labor practice either when considered separately or in their entirety unless prohibited by the language employed in Sec. 8(b) (4) (A) of the Act. The legislative history of this provision is much relied upon by petitioners as demonstrating the congressional intent to make unlawful, conduct by unions commonly referred to as the secondary boycott, directed at either an employer or the products of any person. We have read this history, and the cases indicate that many other courts have done likewise, and we think it can be admitted that it furnishes plausible support for numerous of the contentions advanced by petitioners. We see no point in reviewing it because we find ourselves of necessity returning to the language which Congress embodied in the provision. Regardless of the congressional purpose or the objective sought to be accomplished by the legislation, it is the law which Congress finally enacted by which the merits of the controversy must be determined. The section, so far as here material, provides:

"(b) It shall be an unfair labor practice for a labor organization or its agents—

* * * * * *

"(4) to engage in, or to induce or encourage the employees of any employer to engage in, a strike or a concerted refusal in the course of their employment to * * * handle or work on any * * * materials * * * or to perform any services, where an object thereof is: (A) forcing or requiring * * * any employer or other person to cease using * * * or otherwise dealing in the products of any other producer * * * or to cease doing business with any other person * * *."

It is evident from this unambiguous language that a union is proscribed only from engaging in or inducing or encouraging employees to engage in a strike or a concerted refusal in the course of their employment to handle or work on any materials or to perform any services where an object thereof is to force or require any employer or other person to cease using or otherwise dealing in the products of any other producer or to cease doing business with any other person. More specifically, the objective sought to be accomplished by the union, while material, is alone not sufficient; it only becomes a violation when achieved in the manner specified, that is, by engaging in a strike or by inducing or encouraging employees to do so or to engage in a concerted refusal in the course of their employment. While we agree, for reasons subsequently stated, that the Union activities referred to might furnish the inducement or encouragement for employees to strike or to engage in a concerted refusal to work, yet this would not constitute a violation in the absence of such strike or concerted refusal on the part of the employees "in the course of their employment." The objective must be accomplished by the specific means which the section defines and not otherwise.

We therefore agree with the Board that the Union by-laws and working rules are not illegal *per se* because they are not the means which are inhibited by the statute, and the same is true of the Union's designation of certain contractors as unfair. The most that can be said, as we have observed, is that they may furnish the induce-

ment or encouragement for a strike or concerted refusal to work, but at least until they have done so they are not contaminated with illegality. We also agree with the Board that the mere refusal on the part of the Union to permit its members to work on a job where preglazed sash is used, or a concerted refusal on the part of the employees to do so, does not come within the condemnation of the statute. This is so because the plain language limits the activities to "employees * * * in the course of their employment." We agree with the view that employees cannot be on a strike or engaged in a refusal "in the course of their employment" prior to the establishment of an employer-employee relationship. If Congress had intended to proscribe the refusal to accept employment, either individually or in concert, it no doubt would have employed language appropriate to accomplish such purpose. We suspect that Congress deliberately refrained from so doing in order to escape a serious constitutional challenge. At any rate, we would doubt the power of Congress to make the refusal to work an unfair labor practice. So far as we are aware, people have a right either as individuals or groups to refuse to work for any reason which they may regard as sufficient or for no reason. It is only after the employer-employee relationship has been established that Congress has prescribed a code of conduct for both employer and employee in which it has specifically designated that which constitutes an unfair labor practice on the part of the parties respectively.

We think the decisions of the Supreme Court sustain the view that the heart of Sec. 8(b) (4) insofar as it brings a union within its terms is that either the union must engage in a strike or that it induce or encourage employees to do so or to engage in a concerted refusal to work in the course of their employment. In National Labor Relations Board v. International Rice Milling Co., Inc., 341 U.S. 665, 71 S.Ct. 961, 95 L.Ed. 1284, the case turned, as we understand the opinion, upon the proposition that the union did not induce or encourage the employees of the neutral employer to engage in a concerted refusal because there was only one of such employees involved. The court stated, 341 U.S. at page 670, 71 S.Ct. at page 964:

"A sufficient answer to this claimed violation of the section is that the union's picketing and its encouragement of the men on the truck did not amount to such an inducement or encouragement to 'concerted' activity as the section proscribes."

And on the following page, 341 U.S. at page 671, 71 S.Ct. at page 964, the court stated:

"A union's inducements or encouragements reaching individual employees of neutral employers only as they happen to approach the picketed place of business generally are not aimed at concerted, as distinguished from individual, conduct by such employees."

In Local 74, United Brotherhood of Carpenters & Joiners of America v. National Labor Relations Board, 341 U.S. 707, at page 713, 71 S.Ct. 966, at page 970, 95 L.Ed. 1309, the court stated:

"The statute did not require the individual carpenters to remain on this job. It did, however, make it an unfair labor practice for the union or its agent to engage in a strike, as they did here, when an object of doing so was to force the project owner to cancel his installation contract with Watson's."

So in the instant situation the statute did not condemn the refusal by glaziers to go on a job and it did not require them as individuals to stay on a job. What it did do was to make it an unfair labor practice for the Union or its agents to induce or encourage glaziers to concertedly refuse to work in the course of their employment where an object of such refusal was to force any employer to cease using or selling preglazed sash.

In National Labor Relations Board v. Denver Building & Construction Trades Council, 341 U.S. 675, at page 687, 71 S.Ct. 943, at page 951, 95 L.Ed. 1284, the court in distinguishing and commenting on the Rice Milling Co. case stated:

"The union did not engage in a strike against the customer. It did not encourage concerted action by the customer's employees to force the customer to boycott the mill."

Both the Board and the Union, so we think, place too much emphasis upon the contention that the activities of the Union and its members were primary and, therefore, permissible under the Act. Closely allied with this contention is the argument that the Union was engaged in the rightful endeavor to obtain more work for its members by preventing the use of preglazed sash on the job. In this connection it is pointed out that the Union glaziers were employees of glazing contractors, of which there were only two in the Joliet area, and that there was no dispute between the glaziers and their employers regarding its use, in other words, that the activities of the Union and its glazier members were primary in nature and cannot properly be designated as a secondary boycott. Whatever merit there may be in the premise upon which this argument is predicated, the fact remains that the target was the use of preglazed sash, and any and all who handled, used or sold such sash were the intended and in many cases the actual victims of the Union's course. Moreover, we are not convinced that a Union violation of the provision under discussion is dependent upon whether its activities are primary or secondary. In the Rice Milling Co. case, the Court of Appeals, 5 Cir., 183 F.2d 21, 26, stated:

"The statute clearly provides a remedy for the type of conduct engaged in by the union, without resort to any distinction between primary and secondary activities. If the union's activities come within the language of the statute, they constitute an unfair labor practice, regardless of whether they might have been considered a true 'secondary boycott' under the old common law or under any of the modern and popular theories."

While the Supreme Court reversed the Court of Appeals, it did not do so by distinguishing between primary and secondary activities, but on the basis, as already noted, that there was no encouragement or inducement by the union of concerted activity which the Act proscribes. 341 U.S. 665, 670, 71 S.Ct. 961, 95 L.Ed. 1284.

In the Denver Building Council case, the Court of Appeals, 87 U.S.App.D.C. 293, 186 F.2d 326, 337, refused enforcement of the Board's order on the ground that the union activity was primary and not secondary. The Supreme Court reversed the Court of Appeals and directed enforcement of the Board's order irrespective of the primary nature of the dispute. In doing so the court stated, 341 U.S. 675, 687, 71 S.Ct. 951.

"At the same time that §§ 7 and 13 safeguard collective bargaining, concerted activities and strikes between the primary parties to a labor dispute, § 8(b) (4) restricts a labor organization and its agents in the use of economic pressure where an object of it is to force an employer or other person to boycott someone else."

It was the object of the strike on the part of the union which the court found to be an unfair labor practice. Relative thereto the court stated, 341 U.S. at page 689, 71 S.Ct. at page 952:

"It is not necessary to find that the *sole* object of the strike was that of forcing the contractor to terminate the subcontractor's contract. This is emphasized in the legislative history of the section."

So in the instant situation it is not necessary to find that the sole object of the Union was that of preventing the use of preglazed sash. It is sufficient if that was one of the objects sought to be accomplished, providing, of course, the Union in the accomplishment thereof used a means which the statute designates, that is, by engaging in a strike or by the inducement or encouragement of glaziers to engage in a strike or a concerted refusal to work in the course of their employment.

█ This brings us to a consideration of some of the specific incidents the facts of which petitioners contend constitute a violation of the Act. The Board found a violation in what is referred to as the

Grant Hardware incident and exonerated the Union with reference to all others. Predicated upon the violation found, the Board ordered that the Union

"1. Cease and desist from applying its by-laws in such a manner as to induce and encourage the members of Local No. 27, or otherwise inducing or encouraging the members of Local No. 27, to engage in a strike or a concerted refusal in the course of their employment to perform services for Joliet Paint and Glass Co., or any other employer, where an object thereof is to require their employer or any other employer or other person to cease doing business with any other employer or any person who uses or sells preglazed sash, or has used or sold preglazed sash."

We are of the view that the restraint thus imposed upon the Union embodies substantially all the relief to which petitioners are entitled, and no good purpose could be served in considering each incident separately with a view of determining whether it constitutes a violation. In other words, it is not discernible how it would make any difference in the form of the order whether it was predicated upon one violation, as the Board found, or other violations which we think the Board should have found.

We shall, therefore, refer to a few incidents for the purpose of illustrating our disagreement with the Board. As to the Grant Hardware incident, the Board in its decision states:

"Briefly, the record shows that three glaziers employed by Joliet Paint and Glass Company were engaged in installing plate glass store fronts for Grant Hardware Company, Mazzucco Construction Company having been the general contractor on the project, when they observed preglazed sash on the second floor of the building. Berger, one of the glaziers, called union agent Meyers in Chicago and told him the circumstances. Meyers said: 'You know the conditions of the job and you know the Union rules. Do what is right.' The three glaziers then refused to do the glazing work until Mazzucco

agreed to remove the offending preglazed sash, procure new sash, and have it glazed by the glaziers. We agree with the Trial Examiner that in their context, including the existence of the Union's by-laws, Meyers' response was intended and calculated to induce and encourage Joliet's employees to cease work."

Following this the Board states:

"The remaining incidents each generally involve activity by the Respondent Union similar to that indulged in in the Grant Hardware incident. However, each fails in one or more respects to contain *all* the elements of an 8(b) (4) (A) violation."

The Board proceeds:

"Thus, the Bockholdt incident, discussed in the Intermediate Report, contained no overt inducement or encouragement of any employees by the Respondent Union. The glaziers removed glass from 2 preglazed doors without instructions from either their employer or the Union. Only the mere existence of the by-laws of the Union could constitute inducement and encouragement. However, as already indicated, the by-laws do not, standing alone, constitute inducement and encouragement within the meaning of the statutory prohibitions."

■ We are unable to comprehend, much less agree, that the by-laws standing alone do not constitute inducement or encouragement within the meaning of the Act. In our previous opinion, 193 F.2d at pages 835, 836, we set forth material provisions of the Union by-laws as well as testimony by Union officials as to their purpose and use. For instance, the president of the Union testified that it is the "obligation of the members, not to do any work on the job where glazing is not done on the job. * * * If a member violates that provision he is subject to disciplinary action." These by-laws constitute more than an inducement or encouragement to its members. They are a command both to refuse employment where preglazed sash is used and to cease work when its use is discovered, and a Union member is subject to

penalty if he neglects or refuses to comply with this Union edict. We think it borders on the absurd to reason that this encouragement or inducement element is present only when an agent of the Union informs or calls to the attention of the member what the by-laws require. Certainly the members know what the by-laws require and they have no choice but to refuse to work when discovery is made that preglazed sash is being used.

In International Brotherhood of Electrical Workers v. National Labor Relations Board, 341 U.S. 694, 71 S.Ct. 954, 958, 95 L.Ed. 1299, the court analyzes and discusses the meaning of the words "induce or encourage" as used in the Act. In doing so the court, states 341 U.S. at page 701, 71 S.Ct. at page 958:

> "The words 'induce or encourage' are broad enough to include in them every form of influence and persuasion."

We have already agreed with the Board that the Union by-laws *per se* do not constitute a violation but we disagree with the Board in its holding that they do not constitute the inducement or encouragement which is an element essential to a violation. We hold that they do and that the facts of the Bockholdt incident constitute a violation.

The Board refers to the Ice incident and the Sears Roebuck incident, and concludes that there was no violation because in each case there was only one employee involved, that is, one employee who was on the job and refused to work when preglazed sash was discovered. In view of what we have heretofore said, we agree with the Board that in such situations an essential element is lacking, that is, a concerted refusal on the part of employees in the course of their employment.

As we study this record we are increasingly impressed with the numerous apparent incongruities which abound in the reasoning of the Board, and which we must admit this opinion does little to eliminate. For instance, if two or more glaziers refuse to accept employment because of the use of preglazed sash there is no violation as they have not concertedly refused to work in the course of their employment. However, if they discover the use of preglazed sash after they are on the job and then refuse to work, it is a violation because they have done so in the course of their employment. At the same time, if there is only one glazier on each of several jobs and they each refuse to work, it is not a violation because their refusal is not concerted. These incongruities and others which could be mentioned are unavoidable because of the plain unambiguous language employed by Congress in enumerating the elements required to constitute a violation.

The Board failed to find that respondent Hoffman was an agent of the Union and it is suggested that we should do so. We do not see any materiality in the point inasmuch as the cease and desist order which the Board has entered is directed at the Union "and its agents." If the order should be violated, we suppose that all agents who are responsible therefor would be liable, and if that contingency should arise it will be time enough to determine Hoffman's responsibility.

While, as noted, we have disagreed with the reasoning of the Board in one material respect, it is not discernible how that disagreement requires any modification of the Board's cease and desist order. The Union by-laws not being illegal *per se,* we think that neither the Board nor this court could order their discontinuance. At the same time, in view of what we have held, their continued use would seem to be a hazard for the Union because they in themselves constitute one of the required elements, that is, inducement or encouragement on the part of the glazier employees.

The petition to review and modify the order of the Board is denied.