Charles T. DOUDS, Regional Director of the Second Region of the National Labor Relations Board, for and on behalf of the National Labor Relations Board, Petitioner,

v.

LOCAL 707 and LOCAL 1205, INTERNATIONAL BROTHERHOOD OF TEAMSTERS, CHAUFFEURS, WAREHOUSEMEN & HELPERS OF AMERICA, AFL–CIO, Respondents.

United States District Court
S. D. New York.

Sept. 24, 1957.

Alvin Lieberman, and Allen DeLong, Washington, D. C., for petitioner, Alvin Lieberman, Washington, D. C., of counsel.

Joseph T. King, Washington, D. C., for Charging Party, Atlantic-Pacific Mfg. Corp.

Nicholas S. Falcone, New York City, for respondent Local 707.

Schulman & Goldberg, New York City, for respondent Local 1205, Howard Schulman and Moe Schneider, New York City, of counsel.

HERLANDS, District Judge.

This motion for a temporary injunction is made by the National Labor Relations Board (N.L.R.B.), pursuant to Labor Management Relations Act, section 10(*l*), 29 U.S.C.A. § 160(*l*) (herein cited as L.M.R.A.).

Petitioner seeks to enjoin (pending N.L.R.B. hearing and decision) respondents from continuing certain acts alleged to be in violation of L.M.R.A. section 8 (b) (4) (A) and (B), 29 U.S.C.A. § 158 (b) (4) (A, B). Respondents are Local 707 and Local 1205, both affiliated with International Brotherhood of Teamsters, Chauffeurs, Warehousemen, and Helpers of America, AFL-CIO (herein respectively called Local 707 and Local 1205).

Upon the entire record, the Court makes the findings of fact and conclusions of law hereinafter set forth.

### Findings of Fact

1. Petitioner is Regional Director of the Second Region of the Board, an

agency of the United States, and filed the petition herein for and on behalf of the Board.

2. Respondents Local 707 and Local 1205, both affiliated with the International Brotherhood of Teamsters, Chauffeurs, Warehousemen, and Helpers of America, AFL-CIO (herein respectively called Local 707 and Local 1205), are unincorporated associations and are labor organizations within the meaning of sections 2(5), 8(b) and 10(*l*) of the Act, 29 U.S.C.A. §§ 152(5), 158(b), 160(*l*). At all times material herein, respondents have been engaged within this judicial district in promoting and protecting the interests of their respective employee-members and in transacting business.

3. On or about August 12, 1957, Atlantic-Pacific Manufacturing Corporation (herein called A-P), pursuant to the provisions of the Act, filed an amended charge to a charge originally filed with the Board on July 2, 1957. Said amended charge alleged that respondents have engaged in, and are engaging in, unfair labor practices within the meaning of section 8(b), subsections (4) (A) and (4) (B) of the Act.

4. The said charges were referred to petitioner as Regional Director of the Second Region of the Board for investigation, and were investigated by petitioner and under his supervision.

5. A-P, a New York corporation, is engaged in the manufacture, sale and distribution of marine life-saving equipment. During the past year, it manufactured and shipped to points outside the State of New York, equipment valued at approximately $1,000,000.

6. There is, and petitioner has, reasonable cause to believe that:

(a) In June 1955, A-P employed 190 employees, of which five were truck drivers. Since on or about June 5, 1957, respondent Local 1205 has been picketing A-P for recognition as the collective bargaining representative of A-P's truck drivers. On June 10, 1957, respondent Local 1205 advised A-P that it represented a majority of the truck driver-

employees of A-P and requested recognition and a contract from A-P for said truck drivers. On June 11, 1957, the truck driver-employees went on strike and picketed. On June 11, 1957, Local 1205 again requested an agreement from A-P for the truck driver-employees. On June 11, 1957, A-P filed a petition with the Board for representation for a unit of all of its employees, excepting statutory exclusions. On August 20, 1957, Local 1205 filed a petition with the Board for representation for a unit of the truck driver-employees only. Both petitions are presently pending and undetermined before said Board. Four of the five truck drivers were still on strike on August 27, 1957, the date of the hearing in these proceedings.

(b) At no time material herein, has respondent Local 1205 been certified as the collective bargaining representative of any of A-P's truck drivers.

(c) On June 26, 1957, other employees of A-P operated the A-P trucks for one day. Thereafter, A-P retained outside people to operate these trucks, one of whom was named Gallo and another named Mamolite.

(d) At all times material herein, Ralph Quinnonez, Edmund Brovarski, Sigmund Brovarski, John Dwyer, and Thomas Salvio were agents and representatives of respondent Local 1205.

(e) On June 26, 1957, an A-P truck (driven by Herman Hinsch, an employee of A-P) and on August 22, 1957, an A-P truck (driven by Mamolite, not an employee of A-P, but an independent contractor), both carrying freight of A-P, appeared at a loading platform at the foot of 26th Street, Brooklyn, which platform contained a sign "Acme Fast Freight." At said location, Acme employed three persons on a stagger system, with two employees present at a time. At least one of said employees was called "assistant foreman" and was responsible for operating the station. Working at the same location, were persons who were employed by Delaware, Lackawanna and Western Railroad and who mingled with Acme employees.

On June 26, 1957, there were approximately ten persons on the Acme platform and in the shanty located on said platform. On that date, the above-mentioned Edmund Brovarski ordered, instructed, requested and appealed to employees of Acme to refuse to accept, handle or work upon A-P freight.

On August 22, 1957, there were several persons on the Acme platform handling, packing and unloading freight. On that date, the above-mentioned John Dwyer ordered, instructed, directed, requested and appealed to the employees of Acme to refuse to accept, handle or work upon A-P freight.

On both occasions, the A-P freight was accepted and handled by the persons on the Acme platform.

(f) On August 20, 1957, Mamolite, operating an A-P truck, attempted to make a delivery at Durkee Co., Inc., in New York City. Durkee Co., Inc. did not accept said delivery. However, there is no credible evidence that employees of Durkee were approached by respondents in an effort to induce them to refuse to handle A-P's freight.

(g) On June 28, 1957, on the bulkhead between Piers 20 and 21, North River, New York, the driver of an A-P truck handed sheets in the office window to George Fleischmann, a receiving clerk of Republic Carloading & Distributing Company.

The above-mentioned Thomas Salvio told Fleischmann that A-P was on strike and that he should stop receiving A-P freight. Fleischmann was alone in the office at the time. Fleischmann told Salvio that he could not stop receiving, but that one Mr. Heiselmann, his supervisor, was the man to see. Thereafter, Mr. Heiselmann appeared on the scene, took the freight papers from Fleischmann, and gave them back to the A-P driver, who left in the A-P truck.

(h) On June 28, 1957, Mamolite, operating a truck containing A-P merchandise, attempted to make delivery to Alan Transport Company, located at 422 Carlton Avenue, Brooklyn, New York. Respondent Local 1205 (acting through Ralph Quinnonez) ordered, instructed directed, requested and appealed to the employees of Alan to refuse to accept, handle or work upon said A-P freight. Alan did not accept the freight.

(i) Alan, at the date of the incident referred to in "(h)," supra, had a collective bargaining agreement with Local 816, affiliated with the International Brotherhood of Teamsters, Chauffeurs, Warehousemen, and Helpers, AFL-CIO. This agreement pertinently provided:

"It shall not be a violation of this Agreement and it shall not be cause for discharge if any employee or employees refuse to go through the picket line of a Union or refuse to handle unfair goods, nor shall the exercise of any rights permitted by law be a violation of this Agreement. The Union and its members, individually and collectively, reserve the right to refuse to handle goods from or to any firm or truck which is engaged or involved in any controversy with this or any other union; and reserve the right to refuse to accept freight from, or to make pickups from, or deliveries to establishments where picket lines, strikes, walkouts or lock-outs exist."

(j) On August 19, 1957, an A-P truck (operated by employees of Mamolite) made a delivery of A-P freight to Wilson Freight Forwarding Company at Pier 22, East River, New York. Respondent Local 1205, acting through Ralph Quinnonez, ordered, instructed, directed, requested and appealed to an employee of Wilson to refuse to accept, handle, or work upon said A-P freight. The freight was nevertheless accepted.

(k) On August 19, 1957, Associated Transport, Inc., located on Washington Street, New York, refused to accept A-P freight. Herman Hirsch, production control manager of A-P, appeared at Associated. He heard the above-mentioned John Dwyer tell unidentified truck drivers not to patronize Associated because Associated was dealing with a scab outfit. There is lack of proof as to whom the said unidentified truck

drivers worked for or whether they were employed by any particular firm. However, Hirsch saw Dwyer speaking to various persons whom he identified as Associated employees.

(*l*) On August 19, 1957, Associated had a collective bargaining agreement with respondent Local 707 covering drivers, platform men and other categories of workers, as particularly set forth in Section 3 of said agreement. Section 11 of said agreement provided:

"Chauffeurs or drivers shall make deliveries as required, except that they shall not be held responsible for losses occurring in making inside deliveries. However, an employee shall not be required to cross a picket line or deliver or receive freight from a business establishment at which a strike is being conducted."

(m) On July 29, 1957, Mamolite, operating an A-P truck, attempted to deliver freight to RC Motor Lines in New York City. Respondent Local 1205, acting through the above-mentioned Quinnonez, ordered, instructed, directed, requested and appealed to employees of RC to refuse to accept, handle or work on A-P freight. The freight was refused. RC at all pertinent times had a collective bargaining agreement with respondent Local 707, which agreement contained a section numbered "11," whose text and coverage were the same as that set forth in "(*l*)," supra.

(n) Respondent Local 707 is (and at all material times was) the collective bargaining representative of certain categories of workers employed by various firms in the New York area, which firms included Middle Atlantic Transport Company, Inc. and Terminal Cartage Corporation.

(o) In furtherance of respondent Local 1205's objectives—as described in "6(a)," supra—respondent Local 707 assisted Local 1205 as follows: Local 707 requested Middle Atlantic and Terminal to embargo A-P freight and also requested Local 707 members employed by Middle Atlantic and Terminal to refuse to handle A-P freight.

(p) On June 28, 1957, A-P trucked freight to Terminal. One Plauska (a Local 707 shop steward at Terminal) was informed by one James Flanagan (a Local 707 shop steward working at Middle Atlantic) that A-P was on strike. Thereupon, Plauska told the Terminal platform men (who were Local 707 members) that A-P freight was unacceptable. Said A-P freight was accordingly refused.

(q) One Glenn Jackson is a non-union billing clerk employed by Middle Atlantic. On June 28, 1957, an A-P truck sought to deliver freight to Middle Atlantic. The above-mentioned Flanagan told Jackson to "hold up on the freight until he got word." One-half hour later, Flanagan came back and told Jackson "to give the freight back because it is strikebound freight." Jackson returned the freight to A-P. There is no record evidence to indicate whom Flanagan consulted or who instructed Flanagan.

(r) At all material times, Local 707 had collective bargaining agreements with Middle Atlantic and Terminal. The said agreements contained a section numbered "11," whose text and coverage were the same as that set forth in "(*l*)" supra.

(s) In the two instances where respondent Local 707 approached the employees of secondary employers: Local 707 had a collective bargaining agreement with such secondary employers; the employees approached were members of Local 707; and said agreement contained a "hot cargo" clause.

(t) In none of the instances where respondent Local 1205 approached the employees of secondary employers did Local 1205 have a collective bargaining agreement with such secondary employers.

(u) By the acts and conduct set forth above in Findings of Fact "6(e)," "6(g)," "6(h)," "6(j)," "6(k)" and "6(m)," respondent Local 1205 has, since June 26, 1957, engaged in and has in-

duced and encouraged employees of Acme, Republic, Alan, Wilson, Associated and RC to engage in a concerted refusal in the course of their employment to process, transport, and otherwise handle and work on goods, articles, materials and commodities of A-P.

(v) Objects of the acts and conduct of respondent Local 1205 set forth in Findings of Fact "6(e)," "6(g)," "6(h)," "6(j)," "6(k)," and "6(m)" have been and are: (1) to force or require Acme, Republic, Alan, Wilson, Associated and RC to cease doing business with A-P and (2) to force or require A-P to recognize or bargain with respondent Local 1205 as the collective bargaining representative of the truck driver employees of A-P, notwithstanding the fact that respondent Local 1205 has not been certified as such representative pursuant to the provisions of Section 9 of the Act, 29 U.S.C.A. § 159.

(w) The acts and conduct of respondent Local 1205, as set forth in Findings of Fact "6(e)," "6(g)," "6(h)," "6(j)," "6(k)" and "6(m)" occurring in connection with the operations of A-P have a close, intimate and substantial relation to trade, traffic and commerce among the several states and tend to lead and do lead to labor disputes burdening and obstructing commerce and the free flow of commerce.

(x) It may reasonably be anticipated that, unless enjoined and restrained, respondent Local 1205 will continue and repeat the acts and conduct set forth in Findings of Fact "6(e)," "6(g)," "6(h)," "6(j)," "6(k)" and "6(m)" or similar or like acts and conduct.

## Conclusions of Law

1. This Court has jurisdiction of the parties and of the subject matter of this proceeding and is empowered to grant injunctive relief under Section 10(l) of the Act.

2. Respondents Local 707 and Local 1205 were at all material times and are labor organizations within the meaning of sections 2(5), 8(b), and 10(l) of the Act.

3. Ralph Quinnonez, Edmund Brovarski, Sigmund Brovarski, John Dwyer and Thomas Salvio were, at all material times, and are representatives of respondent Local 1205 and its agents, within the meaning of sections 2(13), 8(b) and 10(l) of the Act.

4. At all material times, James Flanagan was employed by Middle Atlantic and also was a shop steward of respondent Local 707 at Middle Atlantic.

5. There is, and petitioner has, reasonable cause to believe that:

(a) A-P is engaged in commerce within the meaning of section 2, subsections (6) and (7) of the Act.

(b) Local 1205 has engaged in unfair labor practices within the meaning of section 8(b) and subsections (4) (A) and (4) (B) of the Act, affecting commerce within the meaning of section 2, subsections (6) and (7) of the Act, and a continuation of such practices will impair the policies of the Act as set forth in section 1(b) thereof, 29 U.S.C.A. § 141(b).

6. To preserve the issues for the determination of the Board, as provided in the Act, and to avoid irreparable injury to the policies of the Act and to the public interest, it is appropriate, just and proper that, pending final disposition by the Board of the matters herein involved, Local 1205, its officers, representatives, agents, servants, employees, members and attorneys and other persons active on behalf of respondent Local 1205, be enjoined and restrained from the commission and continuance of the acts and conduct set forth in Findings of Fact "6(e)," "6(g)," "6(h)," "6(j)," "6(k)" and "6(m)" and similar or like acts and conduct, the commission of which in the future is likely and may reasonably be anticipated.

7. The "hot cargo" clause (quoted in Finding of Fact "6[l]") renders it lawful and proper for respondent Local 707 to request its members who are employed by secondary employers to refuse to handle any goods sought to be delivered to such secondary employers by A-P, the

primary employer whose employees are engaged in a lawful strike.

8. The acts of respondent Local 707 (as set forth in Findings of Fact "6[o]" to "6[r]," inclusive) were proper and lawful.

9. Petitioner is not entitled to the injunctive relief sought herein against respondent Local 707; and the petition herein is denied with respect to respondent Local 707.

### Discussion

Petitioner seeks a temporary injunction under L.M.R.A. section 10($l$), which relevantly provides:

"Whenever it is charged that any person has engaged in an unfair labor practice within the meaning of paragraph (4) (A), (B), or (C) of section 158(b) of this title, the preliminary investigation of such charge shall be made forthwith and given priority over all other cases except cases of like character in the office where it is filed or to which it is referred. If, after such investigation, the officer or regional attorney to whom the matter may be referred has reasonable cause to believe such charge is true and that a complaint should issue, he shall, on behalf of the Board, petition any United States district court within any district where the unfair labor practice in question has occurred, is alleged to have occurred, or wherein such person resides or transacts business, for appropriate injunctive relief pending the final adjudication of the Board with respect to such matter. Upon the filing of any such petition the district court shall have jurisdiction to grant such injunctive relief or temporary restraining order as it deems just and proper, notwithstanding any other provision of law: * * * ".

■ The N.L.R.B., upon the filing of appropriate charges could find the offending union guilty of an unfair labor practice, issue a cease and desist order [L.M.R.A. section 10(a), (b) and (c)], and petition the appropriate United States Court of Appeals for enforcement of the order [L.M.R.A. section 10(e)]. Congress, however, realized that plenary hearings before the Board on such charges often are time-consuming; that it would take additional time, even after the N.L.R.B.'s decision, to achieve enforcement through the appropriate Court of Appeals; and that speedy action is required in many secondary boycott cases. Therefore, Congress enacted L.M.R.A. section 10($l$) to provide for immediate temporary relief. See S.Rep.No. 105, 80th Cong., 1st Sess. 8 (1947).

■ Before a 10($l$) injunction is granted, there must be sufficient evidence before the Court to show that there was basis for the Board's finding that it had "reasonable cause to believe" that there has been a violation of the Act. The evidence before the Court need not necessarily be sufficient to prove definitively a violation of the Act. The quantum of proof necessary for the issuance of a 10($l$) injunction ·is less than that required for the N.L.R.B. to find an actual violation of the Act. Douds v. International Longshoremen's Ass'n, 2 Cir., 1957, 242 F.2d 808; Shore v. Building & Construction Trades Council, 3 Cir., 1949, 173 F.2d 678; Douds v. Seafarers' International Union, etc. A.F.L.-C.I.O., D.C.E.D.N.Y.1957, 148 F.Supp. 953; Douds v. International Brotherhood of Teamsters, D.C.S.D.N.Y.1956, 139 F. Supp. 702; Douds v. Local 294, International Brotherhood of Teamsters, A.F.L., D.C.N.D.N.Y.1947, 75 F.Supp. 415.

In this case, the charge is that the respondents violated L.M.R.A. section 8(b) (4) (A) and (B). This "secondary boycott" section provides:

"(b) It shall be an unfair labor practice for a labor organization or its agents—

* * * * *

"(4) to engage in, or to induce or encourage the employees of any employer to engage in, a strike or a · concerted refusal in the course of their employment to use, manufac-

ture, process, transport, or other-wise handle or work on any goods, articles, materials, or commodities or to perform any services, where an object thereof is: (A) forcing or requiring any employer or self-employed person to join any labor or employer organization or any employer or other person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person; (B) forcing or requiring any other employer to recognize or bargain with a labor organization as the representative of his employees unless such labor organization has been certified as the representative of such employees under the provisions of section 159 of this title; * * * ".

Petitioner claims that respondents have violated the above section by having their agents approach employees of the secondary employers, in order to induce or encourage such employees to refuse to handle the goods of the primary employer (A-P) in the course of their employment, in order to force the secondary employers to cease doing business with A-P and also in order to require A-P to recognize Local 1205, a non-certified union.

Respondents raise two preliminary points. First, in relation to the Acme incident, respondents argue that, at most, only one employee (as defined by L.M.R.A. 2[3]) was approached, and that the other persons approached were railroad workers and supervisors. However, the testimony cited by Local 1205 to support this contention (Trial Record, pp. 224–232) indicates that several employees of Acme were characterized as "assistant foremen." Such a characterization, by itself, is insufficient to take these persons out of the classification of "employees" as defined in L.M.R.A. 2(3), in light of the nature of the work that the record indicates they were actually performing. A definitive determination

of their classification will await the Board's ultimate decision based upon a plenary hearing. See Packard Motor Car Co. v. N. L. R. B., 1947, 330 U.S. 485, 67 S.Ct. 789, 91 L.Ed. 1040; N. L. R. B. v. Whitin Machine Works, 1 Cir., 1953, 204 F.2d 883; Red Star Express Lines of Auburn v. N. L. R. B., 2 Cir., 1952, 196 F.2d 78. For present purposes, this Court finds that the Board has adequate evidence constituting "reasonable cause to believe" that the persons approached were "employees."

■ The second preliminary point raised is whether or not there was reasonable cause to believe that the Republic incident constituted a violation of section 8(b) (4) (A) and (B). There, the evidence indicates that only one employee was approached. The mere fact that only one employee was approached does not legitimatize the inducement; the conduct may nevertheless violate the Act. Such is the holding in Amalgamated Meat Cutters, etc., A.F.L., Local 88 v. N. L. R. B., 1956, 99 U.S.App.D.C. 24, 237 F.2d 20, certiorari denied 352 U.S. 1015, 77 S.Ct. 556, 562, 1 L.Ed.2d 545. But see Joliet Contractors Ass'n v. N. L. R. B., 7 Cir., 1953, 202 F.2d 606, certiorari denied 346 U.S. 824, 74 S.Ct. 40, 98 L.Ed. 349.

The major issue in this case involves the effect of the so-called "hot cargo" clause. In these incidents where there were no hot cargo clauses (see Findings of Fact "6[e]," "6[g]," and "6[j]") there is reasonable cause to believe that there was a violation of the Act. N. L. R. B. v. Denver Building & Const. Trades Council, 1951, 341 U.S. 675, 71 S.Ct. 943, 95 L.Ed. 1284; Kon-Tempo Furniture, Inc., v. Kessler, D.C.E.D.N.Y.1956, 145 F.Supp. 341.

However, the incidents involving hot cargo clauses present an important and challenging legal question. Such clauses are found in each of the collective bargaining agreements between Local 707 and Associated, RC, Terminal, and Middle Atlantic. All of these clauses were identical. (For text, see Finding of Fact "6[l].") In the collective bar-

gaining agreement between Local 816 and Alan, there is another type of hot cargo clause. (For text, see Finding of Fact "6[i].")

The impact of these hot cargo clauses upon the concept of "secondary boycotts" to the extent that it is embodied in section 8(b) (4) has given rise to varying opinions both before the Board and the courts. A consideration of this interpretive history helps to set the present case in sharp focus.

In the first such matter to come before the Board (Rabouin, d/b/a Conway's Express, 87 N.L.R.B. 972 [1949]), the Board held that it was not a violation of section 8(b) (4) (A) for the contracting union to encourage its members (who were employees of the secondary employer) to refuse to handle the goods of the primary employer, where the collective bargaining agreement with the secondary employer contained a hot cargo clause. The Board reasoned that the secondary employer's advance consent (given in the hot cargo clause in the collective bargaining agreement) to the secondary employees' refusal to handle "hot" goods took these goods and said refusal out of "the course of their employment." Because the refusal was not in "the course of their employment," there was no violation of section 8(b) (4) (A). Moreover, in Rabouin, the secondary employer acquiesced in the refusal. The Rabouin decision was followed in Pittsburg Plate Glass Co., 105 N.L.R.B. 740 (1953).

In McAllister Transfer, Inc., 110 N.L.R.B. 1769 (1954) the Board reversed its position. It held that hot cargo clauses violate the policy of the Act. The Board's reasoning in McAllister was that the statutory protection against "secondary boycotts" was for the benefit of the public, and that a single employer was without legal power to waive the public's rights. While concurring with the majority, Chairman Farmer expressed the view that a hot cargo clause was not illegal, but he distinguished Rabouin on the ground that, in McAllister, the secondary employer did not acquiesce in the refusal. Chairman Farmer alluded to the fact that, in McAllister, the employees refused to handle the hot goods even after they were ordered to do so by the secondary employer. Two Board members dissented on the authority and reasoning of Rabouin and Pittsburg Plate Glass.

A third—and presumably the present —position was adopted by the Board in Sand Door and Plywood Co., 113 N.L.R.B. 1210 (1955). In that case, a two-member majority (including Chairman Farmer) held that, while a hot cargo clause was not illegal, the union could approach only the secondary employer (as distinguished from the secondary employees) in an effort to enforce the hot cargo clause. One Board member concurred in the result on the ground that a hot cargo clause is illegal. Two Board members dissented on the authority and reasoning of Rabouin. The majority's position in the Sand Door case has thus far been followed by the Board in all of its subsequent decisions. American Iron and Machine Works Co., 115 N.L.R.B. 800 (1956); Crowley's Milk Co., Inc., 116 N.L.R.B. 1408 (1956); Capital Paper Company and Consolidated Sales Inc., 117 N.L.R.B. No. 95 (1957); Booher Lumber Co., Inc., 117 N.L.R.B. No. 210 (1957).

A divergence in rationale and result among the circuits is reflected in the five Court of Appeals decisions that have passed upon hot cargo clauses. In N. L. R. B. v. Local 1976, United Brotherhood of Carpenters, A.F.L., 9 Cir., 1957, 241 F.2d 147 the Court, in finding a violation of section 8(b) (4) (A), quoted at length from two Board decisions with different rationales, but did not state which rationale it had adopted. One Board rationale thus quoted was that the hot cargo clause is illegal as contrary to public policy, whereas the other Board rationale quoted was that the union could not enforce the hot cargo clause by direct appeals to the secondary employees.

In N. L. R. B. v. Local 11, United Brotherhood of Carpenters, A.F.L., 6 Cir., 1957, 242 F.2d 932, there was no hot

cargo clause concerning the secondary employees involved. By way of dictum, the Court said that a hot cargo clause was unenforceable as contrary to the legislative purpose underlying section 8(b) (4).

In General Drivers, etc., Union, Local 886, A.F.L.-C.I.O. v. N. L. R. B., D.C.Cir., 1957, 247 F.2d 71, where there was a hot cargo clause, the Court sustained the union's direct appeals to its members (the secondary employees) to refuse to handle the goods of a struck primary employer. The Court's reasoning was that a hot cargo clause was legal; that the union may urge its members (the secondary employees) to do what they have a right to do under the collective bargaining agreement with the secondary employer, i. e., act in accordance with the hot cargo clause; that the secondary employer was being compelled only to live up to his own contract, voluntarily entered into in advance of the happening; and that, in view of the foregoing, there was no refusal by the secondary employees to handle in the "course of their employment."

Two Second Circuit decisions have held that the union may enforce a hot cargo clause by direct appeal to its members, the secondary employees. Rabouin v. N. L. R. B., 2 Cir., 1953, 195 F.2d 906; Milk Drivers and Dairy Employees Local Union No. 338, International Brotherhood of Teamsters, etc., A.F.L.-C.I.O. v. N. L. R. B., 2 Cir., 1957, 245 F.2d 817 [Crowley case]. As the Court of Appeals fully stated its position in Crowley, it is not necessary to discuss Rabouin in this opinion.

In Crowley, the unions directed their members (secondary employees) to refuse to handle goods of the primary employer with whom they had a labor dispute. There was a hot cargo clause in the collective bargaining agreements between the unions and the secondary employers. In finding that these union activities were not unfair labor practices, the Court reasoned that there was no violation of the Act unless the unions caused the secondary employees to coerce their employer by their refusal and that there was no coercion of the employer where his employees were directed or encouraged by the unions to act in a manner to which the employer himself had previously consented, as expressed in the hot cargo contract clause.

As a supporting element, the Court observed that such a work stoppage is less vexatious where it occurs pursuant to a contract than when it takes place without contractual rights and without contractual limitations. The Court concluded that, by express contract and upon the unions' election, the handling of hot (struck) goods was not within the scope of employment; consequently, there was no "forcing," "requiring," "concerted refusal in the course of their employment," or "strike"; ergo, no violation. The Court considered the language of section 8(b) (4) (A) and (B) to be plain on this point. On the other hand, viewing the legislative history of section 8(b) (4) as obscure and inconclusive on the · issue whether that section was designed for the public benefit and hence not subject to waiver by private contract, the Court disregarded the Board's argument based upon such history as jejune. Compare 1 Leg.Hist., L.M.R.A.1947, 315, 460; 2 Leg.Hist., L.M.R.A.1947, 1056, 1107, 1350, with S.Rep. 105, 80th Cong. 1st Sess. 8; 1 Leg.Hist., L.M.R.A.1947, 583; 2 Leg.Hist., L.M.R.A.1947, 1106.

█ Clearly, the rule in this Circuit is that the enforcing of a hot cargo clause by direct appeal to the secondary employees by the contracting union is not a violation of section 8(b) (4) (A) and (B).

Applying that rule to this case, we find that Local 707 was not guilty of an unfair labor practice.

Local 1205 is in a critically different position. Local 1205 is not a party to any collective bargaining agreements with the secondary employers in this case. Local 1205, a non-contracting union, cannot properly claim the same immunities and rights as Local 707, a contracting union.

Precisely the same problem was presented in General Drivers Union v. N. L. R. B., supra. In General Drivers Union, the Court held that the contracting union did not violate the Act, but that the other (non-contracting) union could not use the contract as "the basis for a defense."

In Crowley, the Court of Appeals for the Second Circuit said (245 F.2d 817, 822):

"There is no need for a 'defense' unless there has been a violation."

The issue, as a matter of analysis according to Crowley, is not the availability of a "defense" to a violation, but whether there has been a violation at all.

One of the dissenting Judges in General Drivers Union was of the view:

"The operative effect of the employer's consent, is in my view the same, regardless of who it is that reminds the secondary employees of the terms of their contract, and seeks to induce compliance with it."

The same view was expressed by Board members Murdock and Peterson, in their dissenting opinion, in General Drivers Union when it was before the Board. American Iron and Machine Works, Co., 115 N.L.R.B. 800, 805. They argued that—where the failure of secondary employees to handle "hot" goods is not considered to be a "strike" or "a refusal in the course of their employment" because such goods have been taken out of the scope of their employment by the "hot cargo" contract clause—an inducement by any union does not violate the Act for the reason that the non-contracting union is merely asking the secondary employees to refuse to do that which they are not required to do.

The line of reasoning embodied in the dissenting views summarized in the preceding paragraph has been urged upon this Court by respondent Local 1205 in the case at bar. On the other hand, the Board contends that this Court should follow the majority view in General Drivers Union.

While this Court agrees with the result reached in General Drivers Union, the decision herein rests upon different reasons and a different analysis of the operative facts.

The Board points to the statement of the Court of Appeals in Crowley (245 F.2d at page 820) that "normally the secondary employer receives something at the bargaining table" from the contracting union "in exchange for granting the hot cargo clause" to such union. On the basis of the asserted implication of this statement, the next step in the Board's argument is that Local 1205—not having given anything to the secondary employer—should not receive the benefit of the contract's hot cargo clause, i. e., Local 1205 should not be treated as the beneficiary of a contract to which it was not a party.

The hard core of Local 1205's counter-argument is that the secondary employees' refusal to handle A-P's hot freight is (by virtue of the hot cargo clause in the union contract of the particular secondary employer) not within the normal work requirements of the employment of the secondary employees; that Local 1205 simply activated the secondary employees to exercise their existing contract right to refuse to handle hot goods; and that such refusal could have no coercive effect upon the secondary employer because he had agreed prior to the refusal that his employees would have the right to refuse to handle hot goods.

What, in fact, was bargained for and what, in law, were the mutual rights and privileges of the parties to the collective bargaining agreements between the secondary employers and the contracting unions become points of critical inquiry.

■ The agreements between the secondary employers and Local 707 (and, in one case, with Local 816) created a union shop. Locals 707 and 816 thereby became the *exclusive* bargaining representatives for the secondary employees covered by the respective agreements. A fundamental purpose of such agreements was to require the employer to take up all labor matters with the contracting union; and, similarly, to require the

secondary employees, as union members, to adhere to the agreement and their union's rulings and directives, e. g., with respect to wages, hours, grievances, and other terms and conditions of employment. When the parties signed the union contract, they did not intend to give an outside union the privilege of invoking the hot cargo clause; that was a privilege given only to the contracting union and its members, the secondary employees.

█ The contract did not impose a *duty* upon the secondary employees to refuse to handle hot goods. The contract did, however, give the employees and their union the *privilege* to refuse to handle such goods. That privilege, election or option must be exercised in accordance with the other terms and conditions of the contract. Until that privilege (of refusal to handle) is exercised in accordance with the other terms and conditions of the contract, the handling of hot goods remains within the course of employment.

█ If the secondary employees, upon their own initiative or upon the contracting union's request, refuse to handle hot goods, such goods are no longer in the course of their employment. But *until* such action is taken, the handling of hot goods remains "in the course of their employment." The fact that goods are hot does not, *ipso facto*, take them outside the course of employment.

The agreement between Local 707 and the various secondary employers (Respondent Local 1205's Exh. B, Section 11) provides:

"Chauffeurs or drivers shall make deliveries as required, except that they shall not be held responsible for losses occurring in making inside deliveries. However, an employee shall not be required to cross a picket line or deliver or receive freight from a business establishment at which a strike is being conducted."

A reasonable interpretation of the foregoing provision is that the employees may *voluntarily* handle hot goods.

The pertinency of the foregoing analysis becomes even clearer when we consider the hot cargo provisions contained in the union contract of one of the secondary employers (Alan Transport Co., Inc.) with Local 816 (Respondent Local 1205's Exh. A, Article IX). The relevant language of that provision (see *supra* Finding of Fact "6[i]") merits close examination:

"It shall not be a violation of this Agreement and it shall not be cause for discharge if any employee or employees refuse to go through the picket line of a Union or refuse to handle unfair goods * * *. The Union and its members, individually and collectively, reserve the right to refuse to handle goods from or to any firm or truck which is engaged or involved in any controversy with this or any other union; and reserve the right to refuse to accept freight from, or to make pickups from, or deliveries to establishments where picket lines, strikes, walkouts or lock-outs exist.

  *     *     *     *     *

"The Union shall give the Employer notice of * * * intent of the members to refuse to handle unfair goods. The carriers will be given an opportunity to deliver any and all freight in their physical possession at the time of the receipt of notice. * * *

"The insistence by any Employer that his employees handle unfair goods * * * after they have elected not to, and if such refusal has been approved in writing by the responsible officials of the Eastern Conference of Teamsters, shall be sufficient cause for an immediate strike of all such Employer's operations without any need of the Union to go through the grievance procedure herein."

The above provision expressly articulates what is implied in the Local 707 hot cargo clause. Article IX of the Local 816 contract spells out the highly significant fact that the refusal to handle

hot goods may be effectuated only by the exercise of a privilege or right of election possessed by the contracting union and its members.

A different situation is presented when a non-contracting union appeals directly to the employees. At the moment and on the occasion when Local 1205's agents approached and requested the secondary employees not to handle A-P's freight, the handling of such freight—not having previously been refused by Local 707 or the secondary employees themselves—was within the course of employment of the secondary employees. Thus, at the time of the approach and request, local 1205's agents encouraged and induced the secondary employees to engage in a concerted refusal "in the course of their employment" to handle A-P's hot goods, with the object of forcing and requiring the secondary employer to cease handling A-P's goods [section 8(b) (4) (A)], and also with the object of forcing and requiring A-P to recognize Local 1205 [section 8(b) (4) (B)]. It is only *after* such request by Local 1205 and only when the secondary employees decide to comply with such request that the hot cargo falls outside the normal work requirements of the contract, thenceforth rendering the refusal one not in the course of their employment. That result does not retroactively legitimatize Local 1205's acts of inducement and encouragement which, *when committed,* were an effort to induce and encourage the secondary employees to engage in a concerted refusal in the course of their employment to handle A-P's goods.

This decision adopts an interpretation of the hot cargo clause that promotes orderly management and labor relations. The contracting union, as the sole collective bargaining agent for the particular secondary employees, occupies a position vis-a-vis the secondary employer that necessarily excludes the claim of any other of an untold number of unions to invoke the hot cargo clause contained in the collective bargaining agreement. The secondary employer has every reason to regard the goods being delivered to him as goods that will be handled by his employees, unless and until the employees refuse to handle such goods, on their own initiative or upon the instructions of their own union and in accordance with whatever procedures may be prescribed in the union contract.

There are other related functions to be performed by the union in policing the contract. The performance of union contracts requires constant supervision, for it sets up a dynamic relationship, operating through the working hours of each day, entailing various aspects of the work, the work product, and the working conditions—including the health, safety and welfare of the employees. Modern labor union policy takes the view that the welfare of the employees is affected by the welfare of the employer. The various applications of this view are adapted to the exigencies of the particular plant, factory or other place of employment. The contracting union is familiar with the conditions prevailing in each union shop. It can make intelligent decisions appropriate to each place of employment. It can determine whether or not the goods are actually hot. It can determine and evaluate the factors of economic benefit or detriment to itself, its members and the cause of organized labor in general when it decides upon any course of action. The decision to invoke a hot cargo clause, therefore, is not mechanical or clerical. It is frought with serious consequences to the employees and their union, no less than to the affected employer. The secondary employer, his employees and their union must be protected against intermeddlers.

The relative virtue of a stoppage pursuant to a hot cargo clause, as distinguished from a stoppage which amounts to an ordinary boycott, was adverted to by Chief Judge Clark in Crowley (245 F.2d at page 820), where he pointed out that a stoppage under a hot cargo clause is "less vexatious because it can be anticipated and is limited to the situations prescribed in the clause."

In view of the nature of the collective bargaining agreement and the continuing status it creates, it is of the utmost importance—not only to the employer but to the union and the public at large —that the contracting union be the one to enforce and police the agreement. On the basis of public policy, it is a greater deterrent to financially ruinous secondary boycotts to allow only the union which has such ties to the employer to invoke the hot cargo contract clause.

Local 1205 could have gone "through channels" and have asked Local 707 or Local 816, the proper parties, to invoke the hot cargo clause contained in their respective agreements with the particular secondary employers. This is more than a mere matter of protocol.

To summarize, the collective bargaining agreement between Local 707 (or Local 816, as the case may be) and the secondary employers, grants a privilege to such contracting unions and their members to invoke the hot cargo clause in accordance with the terms and conditions of the union contract. Until so invoked by the proper exercise of such privilege, the goods and the handling of the goods are still in the course of employment of the secondary employees. When Local 1205 induced and encouraged the employees to refuse to handle goods which, at the time of the inducement and encouragement, were in the course of such employees' employment, Local 1205 violated section 8(b) (4) (A) and (B).

Local 707 has not committed any unfair labor practice. No injunction may issue against it.

Local 1205 has violated section 8(b) (4) (A) (B). An injunction should issue against it.

Submit order and notice within five days after the filing of this decision.