**Bernard L. ALPERT, Regional Director of the First Region of the National Labor Relations Board, for and on behalf of the National Labor Relations Board**

v.

**TRUCK DRIVERS, WAREHOUSEMEN AND HELPERS LOCAL NO. 340, International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America.**

Civ. No. 1069.

United States District Court
D. Maine, N. D.

April 1, 1958.

Allen R. DeLong, Atty., Nat'l Labor Relations Board, Washington, D. C., Joseph Lepie, Atty., Nat'l Labor Relations Board, Boston, Mass., for petitioners.

Sidney W. Wernick, Portland, Me., for respondent.

Gerald E. Rudman, Bangor, Me., for complaining party.

GIGNOUX, District Judge.

This application for a temporary injunction is brought pursuant to the provisions of § 10(*l*) of the National Labor Relations Act. 29 U.S.C.A. § 160(*l*).

The petitioner, Regional Director of the First Region of the National Labor Relations Board, alleges in his petition, which was filed February 5, 1958, that respondent is an unincorporated association and a labor organization within the meaning of §§ 2(5), 8(b) and 10(*l*) of the Act; that respondent at all times material herein has been engaged within this judicial district in transacting business and in promoting and protecting the interests of its employee members; that jurisdiction of this proceeding is conferred upon this Court by § 10(*l*) of the Act; that on or about January 17, 1958, Viner Bros., Inc., filed a charge with the Board alleging that respondent has engaged in, and is engaging in, unfair labor practices within the meaning of § 8(b) (4) (A) of the Act; that the charge was referred to petitioner and was investigated by him and under his supervision; and that, after investigation, petitioner has reasonable cause to believe the charge is true and that a complaint of the Board based thereon should issue against respondent pursuant to § 10(b) of the Act.

The petitioner further alleges that petitioner has reasonable cause to believe: (a) that Viner Bros., Inc. (hereinafter called Viner), a Maine corporation, engaged at Bangor, Maine, in the manufacture of shoes, has during the past year sold and shipped shoes valued at in excess of $100,000 from its plant to places outside the State of Maine; (b) that Boot and Shoe Workers Union, AFL-CIO, has been the collective bargaining representative of the employees of Viner at all times material hereto; (c) that Viner utilizes common carriers by motor vehicle such as Fox & Ginn, Inc., Penobscot Motor Express, Capitol Motors, and Graves' Express to deliver incoming freight and materials and to pick up outgoing shipments; (d) that respondent has been the collective bargaining representative of the drivers, helpers and warehousemen employed by the above-named carriers at all times material herein; (e) that, since on or about November 1, 1957, Boot and Shoe Workers Union, AFL-CIO, has been engaged in a strike against Viner and has picketed the latter's plant; (f) that at no time material herein has respondent had any labor dispute with Viner; (g) that, since November 4, 1957, respondent has ordered, directed, instructed and appealed to the employees of the above-named carriers and other employers not to make deliveries to or pick-ups from Viner's premises, or to handle or work on products or freight consigned to or from Viner; (h) that as a result of respondent's orders, directions, instructions and appeals, the employees of the above-named carriers and of other employers have refused to make deliveries to or pick-ups from Viner, or to handle products or materials consigned to or from Viner; (i) that, by its conduct, respondent has engaged in, and has induced and encouraged employees of the above-named carriers and of other employers to engage in strikes, or concerted refusals in the course of their employment to use, manufacture, process, transport or otherwise handle or work on goods, articles, materials or commodities, or to perform services;

and (j) that an object of respondent's acts has been and is to force or require the above-named carriers and other employers to cease using, handling, transporting or otherwise dealing in the products of Viner, and to cease doing business with Viner—all in violation of § 8(b) (4) (A) of the Act, and affecting commerce within the meaning of § 2(6) and (7) of the Act.

The petition also asserts that it may fairly be anticipated that respondent will repeat or continue its acts or conduct allegedly violative of § 8(b) (4) (A) of the Act, and that it is essential and appropriate, just and proper, for the purpose of effectuating the policies of the Act, and in accordance with the provisions of § 10(l) thereof, that, pending final disposition of these matters by the Board, respondent be enjoined and restrained from the commission of the acts and conduct above alleged, similar acts and conduct, or repetitions thereof. The petition prays for an order directing respondent to show cause why an injunction should not issue enjoining and restraining respondent and all its representatives from conduct proscribed by the Act.

On this petition, an order to show cause was issued on February 5, 1958. Respondent's answer, filed February 10, 1958, denies the material allegations of the petition, and sets forth as an affirmative defense the "hot cargo" clause in its collective bargaining agreement with the above-named carrier-employers, which it alleges precludes the activities charged against it by petitioner from being a violation of § 8(b) (4) (A) of the Act.

Hearing was held on February 13 and 14, 1958, and briefs and suggested findings of fact and conclusions of law were submitted by the parties on March 10, 1958. A reply brief was filed with the Court by petitioner on March 21, 1958.

The following opinion contains the findings and conclusions required by Rule 52(a) of the Federal Rules of Civil Procedure, 28 U.S.C.A.:

1. Section 8(b) (4) (A) of the Act, 29 U.S.C.A. § 158(b) (4) (A) provides:.

"(b) It shall be an unfair labor practice for a labor organization or its agents—* * *

"(4) to engage in, or to induce or encourage the employees of any employer to engage in, a strike or a concerted refusal in the course of their employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, materials, or commodities or to perform any services, where an object thereof is: (A) forcing or requiring any employer or self-employed person to join any labor or employer organization or any employer or other person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person * * * *Provided*, That nothing contained in this subsection shall be construed to make unlawful a refusal by any person to enter upon the premises of any employer (other than his own employer), if the employees of such employer are engaged in a strike ratified ' or approved by a representative of such employees whom such employer is required to recognize under this subchapter * * * *"

And § 10(*l*) of the Act provides:

"(*l*) Whenever it is charged that any person has engaged in an unfair labor practice within the meaning of paragraph (4) (A), (B), or (C) of section 158(b) of this title, the preliminary investigation of such charge shall be made forthwith and given priority over all other cases except cases of like character in the office where it is filed or to which it is referred. If, after such investigation, the officer or regional attorney to whom the matter may be referred has reasonable cause to believe such charge is true and that a complaint should issue, he shall, on behalf of the Board, petition any United States district court within any district where the unfair labor practice in question has occurred, is alleged to have occurred, or wherein such person resides or transacts business, for appropriate injunctive relief pending the final adjudication of the Board with respect to such matter. Upon the filing of any such petition the district court shall have jurisdiction to grant such injunctive relief or temporary restraining order as it deems just and proper, notwithstanding any other provisions of law * * * *"

■ 2. Initially, the role of a district court ruling on a petition under § 10.(*l*) of the Act must be distinguished from that of the National Labor Relations Board ruling on a complaint under § 10 (a)–(d) and from that of a circuit court acting on a petition to review or enforce a Board order under either § 10(e) or (f). 29 U.S.C.A. § 160(a)–(f). To the Board has been delegated the duty of finding ultimate facts on the record as a whole. See Universal Camera Corp. v. NLRB, 1951, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456. To the circuit courts has been given a limited review of such Board findings, with substantial evidence the test. See NLRB v. Denver Building & Construction Trades Council, 1951, 341 U.S. 675, 691, 71 S.Ct. 943, 95 L.Ed. 1284; Universal Camera Corp. v. NLRB, supra. By the terms of § 10(*l*) a district court's function is limited to ascertaining whether the Regional Director has "reasonable cause to believe" that the charges filed are true, and to granting such injunctive relief "as it deems just and proper." Douds v. Milk Drivers Union, AFL-CIO, 2 Cir., 1957, 248 F.2d 534, 537–538; Schauffler y. Highway Truck Drivers, 3 Cir., 1956, 230 F.2d 7, 9; Roumell v. United Ass'n of Journeymen of the Plumbing Industry, AFL-CIO, D.C.E.D. Mich.1957, 151 F.Supp. 706, 708; Douds v. Seafarers' Union, AFL-CIO, D.C.E.D. N.Y.1957, 148 F.Supp. 953, 955; Douds v. International Brotherhood of Team-

sters, AFL, D.C.S.D.N.Y.1956, 139 F. Supp. 702, 712.

■ The requirement of § 10(l) that the Regional Director must have "reasonable cause to believe" that a charge is true is met by a showing of a reasonable probability that the petitioner is entitled to final relief. See Brown v. National Union of Marine Cooks, D.C.N.D.Cal.1951, 104 F.Supp. 685, 688; Douds v. Confectionery Jobbers Employees Union, AFL, D.C.S.D.N.Y.1949, 85 F. Supp. 191, 193; Styles v. Local 760, International Brotherhood of Electrical Workers, AFL, D.C.E.D.Tenn.1948, 80 F. Supp. 119, 122. Credible evidence, establishing a prima facie case, is sufficient. See Douds v. Local 294, International Brotherhood of Teamsters AF of L, D.C.N.D.N.Y.1947, 75 F.Supp. 414, 418. And it is quite clear from the language of § 10(l) and from the numerous cases that have interpreted this section that it is not necessary to the granting of the temporary injunction sought by petitioner that this Court find that the charges filed are true, or that, in fact, a violation of the Act has occurred. The final determination of such matters is for the National Labor Relations Board, subject to review by the Courts of Appeal if and when enforcement or review is sought. See Penello v. Milk Drivers Union, AFL-CIO, D.C.Md.1957, 156 F.Supp. 366, 368; Sperry v. Building Material and Construction Union, AFL-CIO, D.C.Neb. 1956, 149 F.Supp. 243, 245–246; Le Bus v. General Truckdrivers, Local 270, AFL-CIO, D.C.E.D.La.1956, 141 F.Supp. 673, 675; Sperry v. Building Trades Council, AFL, D.C.W.D.Mo.1955, 131 F.Supp. 36, 45.

■ Section 10(l) is not, however, mandatory, and the grant or denial of the relief sought is still within the discretion of the district court. United Brotherhood of Carpenters, etc., AF of L, v. Sperry, 10 Cir., 1948, 170 F.2d 863, 869; Elliott v. Amalgamated Meat Cutters, AF of L, D.C.W.D.Mo.1950, 91 F.Supp. 690, 695–696. And it does not follow from the limited function of the district court

in a § 10(l) proceeding that the court must automatically grant an injunction upon the filing of a petition by the Director. While the ultimate merits of the charge against respondent are not to be decided by the court and the quantum of proof required of the director is only that he show "reasonable cause" to believe that there has been a violation of the Act, the court must itself make some determination of facts before it can conclude whether or not the petitioner has shown "reasonable cause". See Douds v. Local 707, International Brotherhood of Teamsters, AFL-CIO, D.C.S.D.N.Y.1957, 156 F.Supp. 240, 246. In this regard it has been well said that:

"What a court must do is to appraise the whole situation, exercising the best judgment it can as to what is the general scope of the facts likely to be proved before the Board, what are the issues of law, and how clear it is what rule of law would be and should be applied by the Board."

Alpert v. United Steelworkers, AFL-CIO, D.C.Mass.1956, 141 F.Supp. 447, 450, and that

"* * * the District Court does not rubber stamp the National Labor Relations Board or any other Government agency."

Hull v. Local 24, International Brotherhood of Teamsters, AFL-CIO, D.C.N.D. Ohio 1957, 148 F.Supp. 145, 147. Nor can this Court construe the recent opinion of the Court of Appeals for the Second Circuit in Douds v. Milk Drivers Union, AFL-CIO, supra, as indicating a contrary conclusion, for in that case Judge Moore, speaking for the majority, expressly included among the issues presented in a § 10(l) proceeding the question of whether "* * * the Director and the District Court have before them facts indicating 'reasonable cause'". 248 F.2d at page 538.

It is on this basis, therefore, that this Court will proceed to examine the facts, viz., to determine whether evidence has been presented which would warrant a determination that the petitioner has

"reasonable cause" to believe the Act is being violated, and if so, whether the relief the petitioner alleges to be "appropriate" or some other form of relief would be "just and proper".

3. In the instant case the following facts, as alleged in the complaint, exist without dispute, either through stipulation or through testimony: Viner is a Maine corporation, engaged at Bangor, Maine, in the manufacture of shoes, and has sold and shipped in interstate commerce during the past year shoes valued in excess of $100,000; at all times material herein, Boot and Shoe Workers Union, AFL-CIO, has been the collective bargaining representative of the employees of Viner; Viner normally utilizes common carriers by motor vehicle, including Fox & Ginn, Inc., Penobscot Motor Express, Capitol Motors and Graves' Express to deliver incoming freights and materials and pick up outgoing shipments; at all times material herein respondent has been the collective bargaining representative of the drivers, helpers and warehousemen employed by the above-named carriers; since on or about November 1, 1957, Boot and Shoe Workers Union, AFL-CIO, has been engaged in a strike against Viner and has picketed the latter's plant at Bangor, Maine; at no time material herein has respondent had any labor dispute with Viner; on or about January 17, 1958, Viner filed with the Board the charge against respondent which precipitated this proceeding; this charge was referred to petitioner and investigated by him and under his supervision; and the present petition was filed by petitioner for and on behalf of the National Labor Relations Board.

It is also undisputed that at all times material herein respondent has had a collective bargaining agreement with each of the carriers concerned and that Article IV of each of these agreements contains a "hot cargo" clause which provides, in relevant part, as follows:

"Article IV

"Unfair Goods

"1. It shall not be a violation of this Agreement, and it shall not be cause for discharge if any employee or employees refuse to go through the picket line of a Union or refuse to handle unfair goods. Nor shall the exercise of any rights permitted by law be a violation of this Agreement. The Union and its members, individually and collectively, reserve the right to refuse to handle goods from or to any firm or truck which is engaged or involved in any controversy with this or any other Union; and reserve the right to refuse to accept freight from, or to make pickups from, or deliveries to establishments where picket lines, strikes, walk-outs, or lockouts exist.

"2. The term 'unfair goods' as used in this Article includes, but is not limited to any goods or equipment transported, interchanged, handled, or used by any carrier, whether party to this Agreement or not, at any of whose terminals or places of business there is a controversy between such carrier or its employees on the one hand, and a labor union on the other hand; and such goods or equipment shall continue to be 'Unfair' while being transported, handled, or used by interchanging or succeeding carriers, whether parties to this Agreement or not, until such controversy is settled.

"3. * * *

"4. The Union shall give the Employer notice of all strikes and/or the intent of the Union to call a strike of any Employer and/or place of business, and/or intent of the members to refuse to handle unfair goods (notice of such intent with respect to unfair goods shall be given the Employer in writing). * * *

"5. The insistence by an Employer that his employee handle unfair goods or go through a picket line after they have elected not to, and if such refusal has been approved in writing by the Eastern Conference of Teamsters and the Legal Department of the International

Union, shall be sufficient cause for an immediate strike of all such Employer's operations without any need of the Union to go through the grievance procedure herein."

Up to this point there is no dispute between the parties as to the facts involved. Nor is there any conflict in the evidence adduced at the hearing as to the actions of the respondent which may be deemed relevant to this proceeding, the entire testimony being that of petitioner's witnesses. This testimony establishes only the following actions of respondent, or its agents, which petitioner contends show "reasonable cause" to believe that respondent has violated § 8(b) (4) (A) of the Act:

(1) A letter dated November 4, 1957, was sent by David Hastings, in his capacity as business agent of respondent, to various common carriers in the Bangor area, including Fox & Ginn, Inc., Capitol Motor Transport Co., Penobscot Motor Express and Graves' Express, with all of whom respondent had negotiated a collective bargaining agreement. The letter referred to Article IV of the agreement and notified management that, pursuant to Article IV, it was

" * * * the intent of our members to refuse to cross the picket line at Viner Bros., Inc., Bangor, Maine and to refuse to handle their merchandise, until such time as the strike of their employees has been settled. Please comply with Article IV of the said Union Contract."

In all cases the letter was addressed to management. Management did not discuss the letter with their employees. Following receipt of the letter, management in some instances instructed their terminal managers to do business as usual with Viner insofar as possible. In some instances management requested its employees to handle Viner goods at the terminal, but in no instance did management instruct the employees to handle such merchandise or threaten or intimidate or suggest punitive action against employees who did not do so, and in all instances the men were left to do as they wished. In fact, some employees chose to handle Viner goods, and others chose not to.

(2) Subsequent to November 4, 1957, George Burns, one of respondent's business agents, visited the Fox & Ginn terminal in Bangor and told Mr. Ralph Hobson, the terminal manager, that Fox & Ginn should not handle Viner goods because they were "unfair goods". At that time three or four Fox & Ginn employees were in the vicinity, at a distance of some five or six feet, and could have heard Mr. Burns' remarks to Mr. Hobson. Mr. Burns also spoke directly to the group of employees advising them that Article IV in the union contract with Fox & Ginn left it entirely up to each man whether he would cross the picket line at Viner, or handle any of Viner's merchandise. At some point in the conversation Mr. Burns said to the men, "Read your contract." Mr. Burns further advised the men that Article IV of the contract meant that no disciplinary action could be taken by the company against any man who chose not to go through the picket line or to handle Viner merchandise. Mr. Burns did not tell the men what they should or should not do, but rather left it up to each one to decide as he saw fit in view of the contract provision.

(3) Subsequent to November 4, 1957, Albert Page Secretary-Treasurer of respondent, spoke to Reginald Estes, an employee at Capitol Motor Transport Co. As Mr. Estes described the conversation, "I asked him (Page) what we should do, that we was kind of in the middle, and he advised us to use our own judgment as an individual and if we wanted to go across the picket line, he couldn't stop us * * *." In the same conversation, Mr. Page mentioned the contract and said, "Look at your contract. Read your contract." On another occasion Mr. Estes telephoned Mr. Page at respondent's headquarters in Portland. With respect to this conversation, Mr. Estes testified: "I asked Mr. Page, I said, 'We got to pick up the shoes,' I said 'The Company has asked us to pick them up or they would find somebody that would.' Well,

he (Page) said, 'I can't tell you to and I can't tell you not to', he says, 'It's in your contract.'" At this point in the testimony, Mr. Estes stated, as his own conclusion, and not as anything that Mr. Page had said, "And I (Estes) know myself that I can't cross a picket line."

(4) At the regular monthly meeting of respondent union held on January 19, 1958, the Viner strike was discussed. There was no evidence to indicate that the subject arose as the result of any preconceived plan. Both Mr. Burns and Mr. Page were there. According to Mr. Estes' testimony, Mr. Page was the one who talked. He said nothing in the meeting about "hot cargo", but referred only to whether the men should, or should not, go through the picket line. He neither told the men to cross the picket line nor told them not to cross it, but said, "Use your own judgment". As one of Fox & Ginn's employees, Reginald Belle, remembered what happened at the meeting, it was Mr. Burns who explained the contract. He did not use the term "hot cargo". He did explain that the men would not have to go through the picket line, and referred to the contract clause which protected the men from disciplinary action by an employer, "saying how we was protected if we choose not to go through a picket line." In effect, he told the men that they knew what their contract said and that it was up to them to do what they wanted.

(5) Subsequent to November 4, 1957, Mr. Page visited the terminal of Penobscot Motor Express to discuss other business. On this occasion, Mr. Page discussed the Viner situation with Penobscot's Chairman and Manager, Mr. Allan Feldman, inquiring as to whether Penobscot had received the Union's letter of November 4, and telling Mr. Feldman, "You know your men don't have to go through." Mr. Page then turned to some of the Penobscot employees who happened to be in the vicinity and asked the men whether they knew they would not have to go through the picket line. In making this remark, Mr. Page took a booklet, which was the union contract,

from his pocket, showed it to the men and said: "There is no definite cause for you to go or not to go out there." Mr. Feldman's testimony was that Mr. Page spoke only with reference to the picket line and, in effect, left it up to the men to decide what they wanted to do.

(6) During the month of January, 1958, Myron Whitcomb, an employee of Graves' Express, drove out to the Viner plant in a Graves' truck for the purpose of making a pickup. When he approached the picket line in front of Viner, he saw Mr. Burns in the vicinity. Upon inquiry, Mr. Burns told Mr. Whitcomb that he could not tell him to go through the picket line or not to go through it, but that there was a clause in his contract dealing with the subject. Thereupon, Mr. Whitcomb returned to Graves without going through the picket line. On another occasion Mr. Whitcomb telephoned Mr. Page in Portland about the Viner strike. Mr. Whitcomb testified that he asked Mr. Page whether the men should or should not cross the picket line at Viner Bros. Mr. Page replied by telling him that he (Page) could not say whether he (Whitcomb) should, or should not, cross the picket line. Mr. Page mentioned the contract and said there was a clause in it about a picket line. At no time during the conversation did Mr. Page mention "hot cargo".

Other testimony established that the normal method of pick-up and delivery between Viner and the carriers is no longer in operation; that although Viner's goods are being transported to the terminals by its own trucks or by local cartage, none of respondent's members are crossing the Viner picket line; and that while some of respondent's members are handling Viner goods at the carriers' terminals, others are not.

This evidence may be summarized as follows: (1) Respondent sent to the carriers the letter which has been mentioned; (2) Respondent, through its agents, told its members both at a regular monthly union meeting and on various visits to the carriers' terminals that it was up to them as individuals to de-

cide whether or not to cross the Viner picket line and to handle Viner goods; that no one could tell them what to do or not to do about this; that they should read their contract; and that a clause in their contract protected them; (3) No member of respondent has been ordered by respondent, or any agent of respondent, not to cross the Viner picket line or not to handle Viner goods; (4) No member of respondent is now crossing the Viner picket line; (5) Some members of respondent are handling Viner goods at the carriers' terminals, and some are not; (6) No disciplinary action has been threatened or taken against respondent's members, either by the carrier employers or by respondent.

4. It is the opinion of this Court that these facts do not add up to reasonable cause for the petitioner to believe that the actions of respondent constituted "inducement" or "encouragement" of the carriers' employees within the proscription of § 8(b) (4) (A) of the Act.

■ At the outset, it is clear that respondent did not commit an unfair labor practice under § 8(b) (4) (A) of the Act by mailing the letter of November 4, 1957, to the carrier employers, calling their attention to Article IV of the contract and requesting their compliance with it. There is nothing in § 8(b) (4) (A) which makes it an unfair labor practice for a union to appeal directly to an employer to induce him to cease doing business with another employer, for this section relates only to appeals to *employees* and does not forbid inducement of *employers*. It has been consistently so held by the courts and by the Board. NLRB v. Local 11, United Brotherhood of Carpenters, AFL, 6 Cir., 1957, 242 F. 2d 932, 935; Rabouin v. NLRB, 2 Cir., 1952, 195 F.2d 906, 912; Douds v. Milk Drivers Local 584, AFL-CIO, D.C.S.D. N.Y.1957, 154 F.Supp. 222, 232–233; American Iron and Machine Works Co., 1956, 115 N.L.R.B. 800, 801; Sand Door and Plywood Co., 1955, 113 N.L.R.B. 1210, 1215.

Similarly, petitioner has cited no case to this Court, and none has come to the Court's attention, in which any United States District Court has issued a preliminary injunction under § 10(*l*) of the Act on facts relating to "inducement" or "encouragement" of *employees* under § 8(b) (4) (A), which are as insubstantial as the facts of the present case. In every such case there was involved something more than merely saying to the employees that it was up to them as individuals to decide what they should do and calling their attention to the provisions of a contract which protected them. In all of these cases in which temporary injunctions have been granted, the inducement or encouragement was constituted by the fact that the respondent union or its authorized agents had *ordered and instructed* the employees not to handle goods (as in Douds v. Local 707, International Brotherhood of Teamsters, AFL-CIO, D.C.S.D.N.Y.1957, 156 F. Supp. 240; Roumell v. United Ass'n of Journeymen of the Plumbing Industry, AFL-CIO, D.C.E.D.Mich.1957, 151 F. Supp. 706; Madden v. General Teamsters Union, AFL-CIO, D.C.E.D.Wis. 1956, 141 F.Supp. 459); or inducement or encouragement was found in the form of *picketing* directed to the employees or the calling of a *strike, or threats of a strike*, by the respondent union (as in Vincent v. Chauffeurs, Local 118, AFL-CIO, 34 CCH Labor Cases No. 17,219, W.D.N.Y.1957; Penello v. Milk Drivers, D.C.Md.1957, 156 F.Supp. 366; Douds v. Milk Drivers, Local 584, AFL-CIO, D.C.S.D.N.Y.1957, 154 F.Supp. 222, affirmed, 2 Cir., 1957, 248 F.2d 534; Alpert v. United Brotherhood of Carpenters, AFL-CIO, D.C.Mass.1956, 143 F. Supp. 371).

It has also been called to this Court's attention that at least two United States District Courts have refused to issue temporary injunctions in situations analogous to the case at bar.[1] In one of these cases (See Pittsburgh Plate Glass Co., 1953, 105 N.L.R.B. 740) the facts

1. Both unreported.

were closely similar to those of the instant case. For the reasons discussed in footnote 10 of the opinion of Chairman Leedom and Member Jenkins in Genuine Parts Co., Nov. 8, 1957, 119 N. L.R.B. No. 53, the district court refused an injunction. In the other case (See Genuine Parts Co., supra), the facts relating to inducement or encouragement were considerably stronger than the facts of the present case. Yet the United States District Court for the Northern District of Georgia refused a temporary injunction. As Member Murdock states in his dissenting opinion in Genuine Parts Co. (CCH Lab. Rep. No. 54,979, at 54,974):

> "The Court could not agree with the general counsel that a union's *advice* to its members as to the rights guaranteed to them by a lawful contract constituted unlawful inducement. \* \* \*"

In summary, it is the opinion of this Court that petitioner has wholly failed to show, as alleged in his petition, that respondent, or its agents, in any way ordered, instructed, directed or appealed to the carrier employees not to handle Viner goods, or to show that the refusal of any carrier employee to handle such goods was other than the employee's voluntary and individual decision. This Court cannot agree with petitioner that respondent's advice to its members as to their rights under their contract constituted unlawful inducement or encouragement within the meaning of § 8(b) (4) (A).

In arriving at this conclusion, the Court has considered the case of International Brotherhood of Electrical Workers, etc. v. NLRB, 1951, 341 U.S. 694, at pages 701–702, 71 S.Ct. 954, at pages 958–959, 95 L.Ed. 1299, cited by petitioner, in which the Supreme Court said, with reference to § 8(b) (4) (A):

> "The words 'induce or encourage' are broad enough to include in them every form of influence and persuasion. There is no legislative history to justify an interpretation that

Congress by those terms has limited its proscription of secondary boycotting to cases where the means of inducement or encouragement amount to a 'threat of reprisal or force or promise of benefit.'"

The decision of the Supreme Court in that case, however, involved the question of whether § 8(c) of the Act immunized peaceful picketing "even though the picketing induces a secondary boycott made unlawful by § 8(b) (4)." The facts of that case do not in any way resemble the facts of the present case, and as stated by Member Murdock in his dissenting opinion in Genuine Parts Co. (CCH Lab. Rep. No. 54,979, at 54,975):

> "It would seem clear, therefore, that the words 'influence and persuasion' as used by the Supreme Court, were intended to embrace conduct, such as *peaceful picketing*, whereby the union sought *affirmatively* to induce, encourage or persuade employees to engage in a strike for a forbidden objective. However broad those terms may be, they are not broad enough to include advice by a union to its members that, as individuals, they have a contractual right to refuse to perform certain work, particularly where, as here, they are also advised that each member must make a decision for himself and, having made it, is free at any time to reverse himself."

5. The last and most difficult issue in this case involves a consideration of the effect of the "hot cargo" clause in respondent's agreement with the carriers. In view of this Court's conclusion that the evidence in the record before it wholly fails to support petitioner's contention that there is reasonable cause to believe that inducement and encouragement of employees by respondent exists, it becomes unnecessary to determine whether the "hot cargo" clause would constitute a defense to conduct which, but for such clause, would violate the Act. Petitioner contends, however, that a "hot cargo" clause is in and of itself a violation of §

8(b) (4) (A) of the Act and that respondent's conduct must, therefore, be considered in the context of an unlawful agreement. In support of this position petitioner relies upon the opinion of Chairman Leedom and Member Jenkins in Genuine Parts Co., supra, holding that a "hot cargo" provision in a contract executed by a common carrier is void because it is contrary to the carrier's statutory and common-law duty to serve all customers within its franchise. Cf. Galveston Truck Line Corp. v. Ada Motor Lines, Inc. I.C.C. No. MC–C–1922 (Dec. 16, 1957). Petitioner's position is that if a "hot cargo" clause is *per se* a violation of the Act, respondent's advice to its members with respect to the "hot cargo" clause in their contract must constitute illegal inducement and encouragement within the meaning of § 8(b) (4) (A). Otherwise stated, petitioner's argument is that the existence of the "hot cargo" clause rendered illegal conduct of respondent which would otherwise not be within the scope of the Act.

The authorities do not sustain petitioner's contention. An analysis of the present status of "hot cargo" clauses both in the courts and before the National Labor Relations Board indicates that there is neither any court decision nor any majority decision of the Board holding that such clauses are in and of themselves violative of the Act. A review of the many decisions in this field within the last few years reveals that neither the courts nor a majority of the Board have accepted the view that the mere existence of a "hot cargo" clause is a violation of the Act, or have gone beyond the position that unions are forbidden by § 8(b) (4) (A) from *affirmatively appealing* to their members for compliance with such clauses.

The Board at one time held that a "hot cargo" clause is a defense to conduct which, but for the clause, would plainly violate § 8(b) (4) (A). See Conway's Express, 1949, 87 N.L.R.B. 972. It is true that a majority of the Board has since rejected the rationale of the Conway decision and no longer follows the

rule of that case, although for varying reasons, See General Millwork Corp., 1955, 113 N.L.R.B. 1084; American Iron and Machine Works Co., 1956, 115 N.L.R.B. 800; Crowley's Milk Co., 1956, 116 N.L.R.B. 1408. But the petitioner concedes that the current majority view of the Board is, as stated in Sand Door and Plywood Co., supra, 113 N.L.R.B. at page 1217:

"We hold that, regardless of the existence of a 'hot cargo' clause, any *direct appeal* to employees by a union to engage in a strike or concerted refusal to handle a product is proscribed by the Act when one of the objectives set forth in Section 8(b) (4)(A) is present." (Emphasis supplied.)

Genuine Parts Co., supra, is the most recent pronouncement of the Board on the impact of "hot cargo" clauses in § 8(b)(4)(A) proceedings. An examination of the opinions of Member Bean and Member Rodgers, who concurred with Chairman Leedom and Member Jenkins to constitute the majority of four in that case, makes it evident that even Genuine Parts Co. is not a decision by a majority of the Board that "hot cargo" clauses are in and of themselves violative of § 8(b)(4)(A). Both Member Bean and Member Rodgers make it clear that they are unwilling to go beyond the Board's ruling in the Sand Door case and are prepared to hold only that "hot cargo" clauses cannot be pleaded as a defense to a violation of § 8(b)(4)(A) which exists independently of the "hot cargo" agreement itself. Member Rodgers makes this entirely clear in the following language (CCH Lab. Rep. No. 54,989, at 54,971–972):

"In concluding that a violation of Section 8(b)(4)(A) occurred in this case, *I am, of course, relying on the factual findings of inducement and encouragement* of employees of secondary employers and the proscribed objective. *I am in no sense including the existence of the 'hot cargo' agreement as an element of that violation.* I am simply saying that,

when all the elements of a violation are present, a 'hot cargo' clause cannot be pleaded as a defense, because such agreements are in derogation of the public policy expressed in the Act and cannot, therefore, serve to immunize and condone unlawful conduct." (Emphasis supplied.)

The impact of "hot cargo" clauses upon conduct otherwise violative of § 8(b)(4)(A) of the Act has given rise to divergent conclusions in the four circuit courts which have considered them. The Courts of Appeals for the District of Columbia and the Second Circuit have held such clauses to be legal and to provide the union with a valid defense to a § 8(b)(4)(A) charge. General Drivers etc. Union, AFL-CIO, v. NLRB, 1957, 101 U.S.App.D.C. 80, 247 F.2d 71, certiorari granted, 1957, 355 U.S. 808, 78 S.Ct. 42, 2 L.Ed.2d 27; Rabouin v. NLRB, 2 Cir., 1952, 195 F.2d 906; Milk Drivers etc. Local No. 338, AFL-CIO, v. NLRB, 2 Cir., 1957, 245 F.2d 817. On the other hand, the Court of Appeals for the Ninth Circuit has held that a "hot cargo" clause is not a defense to conduct otherwise violative of § 8(b)(4)(A). NLRB v. Local 1976, United Brotherhood of Carpenters, AFL, 9 Cir., 1957, 241 F.2d 147, certiorari granted, 1957, 355 U.S. 808, 78 S.Ct. 13, 2 L.Ed.2d 27. And in NLRB v. Local 11, United Brotherhood of Carpenters, AFL, 6 Cir., 1957, 242 F.2d 932, although there was no "hot cargo" clause directly involved, the Court of Appeals for the Sixth Circuit has indicated, by way of dictum, that where all of the elements of a § 8(b)(4)(A) violation are otherwise present, a "hot cargo" clause cannot immunize respondent's conduct. 242 F.2d at page 936.

It is apparent from an analysis of the foregoing decisions that in each case the court found actual inducement of employees by affirmative action of the union. In the Sixth and Ninth Circuits "hot cargo" clauses have been rejected as a defense to otherwise prohibited conduct, but there has been no holding that the public policy against "hot cargo" clauses could create a violation of § 8(b)(4)(A) where none would otherwise exist.

The merits of "hot cargo" defenses will soon be finally settled by the Supreme Court, which on October 14, 1957, agreed to review on certiorari the above-mentioned decisions of the District of Columbia and Ninth Circuit Courts of Appeals. Upon the present state of the authorities, however, this Court can find no support for petitioner's contention that the "hot cargo" clause in respondent's contract with the carriers in the instant case could render unlawful conduct of respondent which, but for the existence of such clause, would not fall within the proscription of § 8(b)(4)(A).

Accordingly, it is ordered that the petition be, and it hereby is, denied.