Bennet F. SCHAUFFLER, Regional Director of the Fourth Region of the National Labor Relations Board, for and on behalf of the National Labor Relations Board, Petitioner,

v.

HIGHWAY TRUCK DRIVERS & HELPERS, LOCAL 107, International Brotherhood of Teamsters, Chauffeurs, Warehousemen & Helpers of America, and Warehouse Employees Union Local 169, International Brotherhood of Teamsters, Chauffeurs, Warehousemen & Helpers of America, Respondents.

Civ. A. No. 26700.

United States District Court
E. D. Pennsylvania.

August 10, 1959.

Jacques Schurre, National Labor Relations Board, Washington, D. C., for petitioner.

Richard H. Markowitz, Philadelphia, Pa., for respondents.

VAN DUSEN, District Judge.

## I. Findings of Fact and Conclusions of Law

This cause came on to be heard upon the verified petition and amended petition of Bennet F. Schauffler, Regional Director of the Fourth Region of the National Labor Relations Board (herein called the Board), for a temporary injunction, pursuant to § 10(*l*) of the National Labor Relations Act, as amended 29 U.S.C.A. § 160(*l*) (herein called the Act), pending the final disposition of the matters involved pending before the Board, and upon the issuance of an order to show cause why injunctive relief should not be granted as prayed in said petition. Respondents filed an answer to said petition. Hearings on the issues raised by the petitions and answer were duly held on July 31 and August 4, 1959. All parties were afforded full opportunity to be heard, to examine and cross-examine witnesses, to present evidence bearing on the issues, and to argue on the evidence and the law. The court has fully considered the petitions, answer, evidence, arguments, and briefs of counsel. Upon the entire record, the court makes the following:

### A. Findings of Fact

1. Petitioner is Regional Director of the Fourth Region of the Board, an agency of the United States, and filed this petition for and on behalf of the Board.

2. Respondents Highway Truck Drivers & Helpers, Local 107, International Brotherhood of Teamsters, Chauffeurs, Warehousemen & Helpers of America, and Warehouse Employees Union Local 169, International Brotherhood of Teamsters, Chauffeurs, Warehousemen & Helpers of America (herein respectively called Local 107 and Local 169), unincorporated associations, are labor organizations within the meaning of §§ 2(5), 8(b) and 10(*l*) of the Act, 29 U.S.C.A. §§ 152(5), 158(b), 160(*l*) and at all times material herein have been engaged within this judicial district in transacting business and in promoting and pro-

tecting the interests of their employee members and members of affiliated labor organizations.

3. On or about April 13 and June 24, 1959, Food Producers Council, Inc. (herein called Council), pursuant to the provisions of the Act, filed charges with the Board alleging, inter alia, that respondents have engaged in, and are engaging in, unfair labor practices within the meaning of § 8(b)(4)(D) of the Act.

4. Said charges were referred to petitioner as Regional Director of the Fourth Region of the Board for investigation, and were investigated by petitioner and under his supervision.

5. There is, and petitioner has, reasonable cause to believe that:

(a) Council is a federation of approximately 100 affiliated organizations which are composed of firms and individuals engaged, among other things, in the production, packing, marketing and transportation of raw and processed agricultural commodities. Council, through its affiliated organizations, acts for and on behalf of members in promoting economy and efficiency in the marketing and distribution of food products. The value of the products marketed by members of Council's affiliates shipped in interstate commerce exceeds one million dollars annually.

(b) Charles W. Karper, Daniels & Griffin, Joy W. Roe, Rockingham Poultry Corp., and others (herein collectively called truckers), are common or contract carriers engaged in the transportation and delivery of freight in interstate commerce, some or all of whom each annually hauls freight across state lines valued in excess of $50,000.

(c) The Great Atlantic & Pacific Tea Company (herein called A & P) and American Stores Company (herein called American) operate multistate chains of retail stores and are engaged in commerce within the meaning of that word as used in the Labor Management Relations Act. The annual gross sales of each of said companies amount to more than $500,000.

(d) At all times material herein, truckers have assigned the work of unloading their trucks at places of delivery, including unloading at the A & P Warehouse at Yeadon, Pennsylvania, and at American's warehouse at 31st and Master Streets, Philadelphia, Pennsylvania, to their own employees who are not members of or represented by respondents.

(e) Since prior to January 24, 1959, respondents have induced and encouraged the truckers to assign the unloading work referred to in Finding of Fact 5(d) above to employees who are members of or represented by respondent Local 107, rather than to employees who are not members of or represented by respondent Local 107.

(f) In support of the inducement and encouragement referred to in Finding of Fact 5(e) above, respondents, since on or about and prior to January 24, 1959, have directed and requested the drivers employed by truckers not to unload, and have refused to permit said drivers to unload, at the A & P and American warehouses.

(g) In further support of the inducement and encouragement referred to in Finding of Fact 5(e) above, respondent Local 169, since on or about January 24, 1959, has instructed, requested and appealed to employees of A & P and American to refuse to receive or handle any products unloaded by said truckers or their drivers.

(h) By their acts and conduct referred to in Finding of Fact 5(f) and (g) above, and by other means, respondents have engaged in, and have induced and encouraged employees of said truckers, A & P, American, and of other employers, to engage in concerted refusals in the course of their employment to use, manufacture, process, transport, or otherwise handle or work on goods, articles, materials, or commodities or to perform services.

(i) An object of respondents' acts and conduct set forth in Finding of Fact 5 (f), (g) and (h) above was and is to force or require truckers to assign the work of unloading their trucks at the A & P and American warehouses, and at

other terminals, to employees who are members of or represented by respondent Local 107 rather than to employees who are not members of or represented by respondent Local 107.

(j) The acts and conduct of respondents set forth in Findings of Fact 5(f), (g), (h) and (i) above, occurring in connection with the operations of Council, truckers, A & P and American, have a close, intimate, and substantial relation to trade, traffic, and commerce among the several States and tend to lead to and do lead to labor disputes burdening and obstructing commerce and the free flow of commerce.

6. It may be fairly anticipated that, unless enjoined, respondents will continue or repeat their acts and conduct hereinabove set forth, or similar or like acts and conduct.

### B. Conclusions of Law

1. This court has jurisdiction of the parties and of the subject matter of this proceeding, and under § 10(l) of the Act is empowered to grant injunctive relief.

2. Respondents are labor organizations within the meaning of §§ 2(5), 8 (b), and 10(l) of the Act.

3. There is, and petitioner has reasonable cause to believe, that:

(a) Council, truckers, A & P and American are engaged in commerce within the meaning of §§ 2(6) and (7) of the Act.

(b) Respondents have engaged in unfair labor practices within the meaning of § 8(b)(4)(D) of the Act, and affecting commerce within the meaning of § 2, subsections (6) and (7) of the Act, and a continuation of these practices will impair the policies of the Act as set forth in § 1(b) thereof.

4. To preserve the issues for the determination of the Board as provided in

the Act, it is appropriate, just and proper that, pending the final disposition of the matters involved pending before the Board, respondents, their officers, representatives, agents, servants, employees, attorneys and all members and persons acting in concert or participation with them, be enjoined and restrained from the commission, continuation, or repitition of the acts and conduct set forth above in Findings of Fact 5(f), (g), (h) and (i), acts or conduct in furtherance or support thereof, or like or related acts or conduct the commission of which in the future is likely or may fairly be anticipated from respondents' acts and conduct in the past.

### II. Discussion

This case concerns the unloading of over-the-road trucks whose drivers are not members of a Philadelphia Local and which come into the Philadelphia area to make deliveries, particularly at food warehouses and plants. Both respondent Local 107 (primarily a union of truck drivers in this area) and respondent Local 169 (primarily a union of warehouse workers in this area) admit that this "has been a problem and  *  *  * probably always will be a problem" (N. T. 23). Local 107 has no stated policy as to the proper person to unload such trucks (N.T. 24). However, where Local 107 has contracts with truckers, such contracts usually provide that members of that local shall unload the trucks.

The record discloses the following activities of Local 107 members and officials in connection with the unloading of trucks not driven by its members:

A. Between September 1956 and November 1958 (6 months before the charge was filed against Local 107; see Exhibit A to Petition),[1] at least five

---

1. Throughout the trial, respondents objected to any testimony concerning incidents prior to November 13, 1958. Such incidents are clearly not admissible as unfair labor practices, but they are admissible to show "the course of conduct" of union members "over a period of time." See Schauffler v. United Ass'n of Journeymen, etc., 3 Cir., 1955, 218 F. 2d 476, 479. They also bear upon the intent of the respondents and lend credibility to the testimony of petitioner's witnesses. See Hull v. Sheet Metal Workers, etc., D.C.N.D.Ohio 1958, 161 F.Supp. 161, 172 and case there cited.

members of Local 107 [2] received pay for unloading over-the-road trucks whose drivers had been assigned by their employers to do this work and whose drivers had this work done because of false statements by members of the respondent Locals [3] that Philadelphia union men were required to do this work. See Appendix.

B. In the period since November 13, 1958, at least five members of Local 107 received pay for doing the unloading work under the circumstances described in paragraph A above (see Exhibits P–2, P–3A, P–8A, Trombetti, and at least one of Mr. Holsinger's unloaders—see Appendix).

■ C. At the Yeadon A & P warehouse, the unloaders have operated since the fall of 1956 under the direction of John Zorowichak,[4] a member of Local 107 since 1956, except for the period from March to June 1959 when he was in a "suspended" status for non-payment of dues, who has been found in another court proceeding to have represented and acted for Local 107 in May and June 1955.[5]

D. At the American (also referred to as Acme) warehouse at 31st and Master Streets, Al Trombetti, a member of Local 107 (N.T. 335), supervises the unloaders and sees that they secure all unloading work during the morning shift in a manner very similar to that adopted by Zorowichak at the A & P warehouse. See testimony of M. Boppe referred to in Appendix.

E. On one occasion about two years ago, a vice-president of Local 107 went to the above-mentioned Acme warehouse at the request of an Acme official and settled a dispute concerning the unloading. Trombetti was accused of making a threat in connection with the unloading of produce trucks and the union vice-

president warned him he would be brought before the executive board if there were any more threats or closing of truck doors, etc. (N.T. 46–48).

F. In April or May 1959, where objection was made by representatives of a meat processing and manufacturing concern to the unloading at his plant of an over-the-road truck by a Local 107 member for reasons not connected with his union membership (N.T. 162–3), two union members, one of whom was a trustee and business agent,[6] came to the plant on his behalf and the matter was adjusted so that the Local 107 member was permitted to unload the truck on that occasion (N.T. 165–8).

G. The receipts show that $18.80 was charged by these unloaders at both the A & P and the Acme warehouses in December 1958 (Exhibits P–3A, P–8A, P–8B) and that $19.60 was charged at both warehouses in 1959 (Exhibits P–2, P–3B, P–9A–C).

The officials of Local 107 testified that they had reprimanded a few of their members (in addition to Trombetti) for improper activities in connection with the unloading of over-the-road trucks and they offered in evidence minutes of a Regular Meeting held December 15, 1957, containing this language:

"Brother Cohen then stated we had a serious situation which we intended to investigate. If the reports were true we intended to do something about it. No one was going to accuse the officials of this union for acts of a certain few members. We had never condoned it and never intended to in the future. We had never authorized any of the members to grab gypsies and shake them down. Some few members would grab a gypsy, claim they had been sent by the union, work a half-

---

2. See Exhibits P–1A, P–1B, P–6, P–7, Zorowichak and Trombetti.

3. Receiving clerks, Zorowichak, Trombetti, and other Local 107 members.

4. N. T. 78, 113, 117–8, 122, 133.

5. See Schauffler v. Highway Truck Drivers and Helpers, 3 Cir., 1956, 230 F.2d 7,

11–12, and Findings filed 7/27/55 in this court in Civil Action No. 19259. This court may take judicial notice of Zorowichak's conduct in recent previous controversies involving Local 107. See Cosentino v. District Council, etc., D.C.D. Puerto Rico 1956, 107 F.Supp. 235.

6. See N. T. 165 and Exhibit D–3.

hour and demand a day's pay. In the law books that was extortion. The Union could not assume responsibility for a few members out of the 14,000 for what they were doing. Brother Cohen wanted to put the Union on record that after an investigation if these acts or supposed to be acts were true, * * * we would bring the guilty individuals to the Union and would issue them withdrawal cards. When we did, we would notify the membership as to who they were."

Then the vice-president testified "We have never had a policy on unloading outside trucks." (N.T. 364).

The record discloses the following activities of Local 169 (representing the warehousemen handling produce and groceries whose job is to move the cargo once it is put on the unloading platform, but who have no jurisdiction to go inside the truck) in connection with the unloading of over-the-road trucks at the A & P warehouse:

A. The receiving clerks who are members of Local 169 have told the truckers they must hire local union men to unload the trucks.

B. A former shop steward of Local 169 at the A & P Yeadon warehouse testified that he had misunderstood the business agent (Mr. Keane) at one time and thought Keane said the over-the-road truck drivers "weren't supposed to unload" but later he learned that such drivers were to be permitted to unload "as long as they didn't cause us any trouble which sometimes they did" (N.T. 187). This shop steward, who only ceased being a steward when he went on the day shift about two months ago, also

testified that the members of his union "on their own * * * feel like they shouldn't have to go into a non-union truck" (N.T. 185). His jack men (who move the goods from the platforms into the warehouse) found it necessary to consult with him on this question of unloading of the trucks (N.T. 186 and 188). About four or five months ago, this shop steward was called to the platform by the receiver or one of the jack men (N.T. 188–190) when an over-the-road truck driver wanted to unload his own truck and a helper wanted to be employed as unloader (N.T. 188–9). A half-hour later, the steward learned that everything had been settled (N.T. 190). Also, this shop steward admitted that "he might have said" to an agent of the board "I told the drivers who didn't want to put on a union man that he just had to sit there, that our man wouldn't go inside his trailer" (N.T. 191).

C. M. Boppe testified that in September 1956 he called Local 169 on the phone to object to the new policy of requiring over-the-road truck drivers to employ an additional helper to do the unloading work (see Appendix, p. C) and was told "It has been a new policy or set-up that an over-the-road driver that comes in cannot unload his own load. We will have to protect our own boys, that they have work." (N.T. 243–4; see, also, N.T. 268).[7]

The business agent of Local 169 testified that the policy of the union was represented by paragraph 44 of its form contract (Exhibit D–2), which provides as follows:

"44. It is agreed that no dealer, farmer, trucker, seller, or supplier, not involved in a strike issue of his

---

7. Although respondents challenged this testimony because the witness testified that, to the best of his recollection, he found Local 169's phone number under "American Federation of Labor," whereas respondents' witness (Mr. Keane, business agent of Local 169), testified that the Local had always been listed in the Philadelphia phone book only under the letter "W" for "Warehouse" (N. T. 355), information secured from the Free Library of Philadelphia indicates that in the "Yellow Pages" phone directory current in September 1956 (issue of October 1955) Local 169 was listed under the heading "Associations" at page 53. Under these circumstances, it seems quite understandable that the witness may not have remembered that he looked in the Yellow Pages for the phone number of the Local, rather than in the regular directory as he thought.

own, shall be intimidated, obstructed, or interfered with by the Union or its members, without regard to Union or non-Union affiliations, in their normal and ordinary transaction of business with the Employer."

The record makes clear that the above-described resistance to the efforts of the over-the-road truckers to unload their own trucks has resulted in many work stoppages, even though they are apparently of short duration, since the drivers capitulate and hire the unloaders in order to get their trucks unloaded.

█ Upon this record, there is reasonable cause to believe that Locals 107 and 169 have induced and encouraged guards, receiving clerks and platform workers of A & P and Acme, as well as the employees of the over-the-road truckers,[8] to engage in a refusal to handle or work on the goods of these truckers in order to force such truckers (as employers) to assign the unloading work to Local 107 members instead of the truck drivers who are either members of other Teamster unions (for example, M. Boppe) or at least non-union members of another class.[9] Petitioner is entitled to draw inferences from consistent actions by union members forming a pattern of concerted activity and evidence that this pattern of activity has continued after union officers assisted, on behalf of their members, in adjusting work stoppages resulting from such activity.[10] There was no testimony of any notice given by Local 107 of its policy to the unloaders at either the

Acme or the A & P warehouse, even though this would certainly not have been difficult to do. Inferences may be drawn that the union was tacitly inducing and encouraging such activity. Similarly, the consistent activity of the Local 169 receiving clerks, in telling the over-the-road drivers that the local union unloaders had to be used and the phone statement from the Local 169 headquarters to the same effect, is proper basis for a finding of inducement and encouragement to concerted activity by that Local.[11]

There is no evidence to show that all the men listed in Exhibit D–1 were unloaders or whether this list included all the unloaders in petitioner's files. The fact that some non-union men acted as unloaders is not inconsistent with normal union policy to permit employment of such men when union men may not have been available.

Although it is recognized that petitioner has not presented strong evidence of agency and has had to rely largely on circumstantial evidence, the ultimate determination of the facts is not being made at this time. See Schauffler v. Highway Truck Drivers, etc., 3 Cir., 1956, 230 F.2d 7, 9. The testimony which the trial judge finds supports a finding of "reasonable cause to believe" under 29 U.S.C.A. § 160(l) has been summarized above and in the Appendix to supplement the analysis of the testimony at pp. 1–9 of the above brief of respondents.[12]

8. The testimony summarized in the Appendix contains evidence of the inducement and encouragement to employees, as well as employers. See cases cited at page 6 of petitioner's Memorandum filed 8/4/59, which is in the Clerk's file.

9. The analysis at pp. 19 ff. of respondents' brief ignores the inferences to be drawn from a pattern of activity shown by the evidence to have existed since the fall of 1956.

10. Respondents overlook the use of evidence as a basis for the drawing of inferences in its analysis at pp. 14 ff. of their brief.

11. Also, the Board may infer from Firmani's testimony that Mr. Keane's testimony is not accurate and that he conveyed the same impression to other members of Local 169 that he did to Mr. Firmani; namely, that over-the-road truck drivers "weren't supposed to unload." See page 10 above. The trial judge does not agree with the analysis of Firmani's testimony at pages 22–23 of respondents' brief.

12. Although the trial was recessed for a weekend and a Monday to give respondents an opportunity to meet petitioner's case, respondents requested, and were

Alpert v. Truck Drivers, Warehousemen & Helpers, D.C.D.Me.1958, 161 F. Supp. 86, relied on by respondents, presented a very different factual situation than the record in this case. In the Alpert case, the union knew that a picket line had been placed and, on numerous occasions, actively advised its members who were faced with the problem of crossing it or not that the decision was one for them to make. In this case, a pattern of activity at two locations, involving illegal demands by Local 107 members and Local 169 receiving clerks that over-the-road truck drivers employ additional men (often union men), has existed since the fall of 1956 and has continued on numerous occasions during the last six months. The only identified leaders of the unloaders are Local 107 members. There is no evidence that either union has actively advised its members at either location that the union policy is one of non-interference with unloading by the over-the-road truck drivers and there is evidence that Local 169's office has stated exactly the opposite when asked its policy on the phone. Local 107 has disapproved specifically only of threats and extortion. Under such circumstances, the petitioner has "reasonable cause to believe" that inducement and encouragement has been given to this consistent pattern of activity by union members.

Also, this injunction will only require the respondents to take more action to carry out policies which they have already established, so that it will not impose any burden upon them.

█ The court recognizes that it would be unfair and improper to hold Local 107 responsible for activities of unloaders who are not its members and do not act in concert with it and of unloaders who are its members and whom it

has made efforts to inform of its policy, as testified to by its Vice-President, but Local 107 can fairly be required to make greater efforts to inform these unloaders at places such as the A & P and Acme warehouses of this policy than is shown by this record. Local 169 has stated that it has no objection to posting or publicizing the terms of paragraph 44 of its agreement (see footnote 9, p. 25, of respondents' brief). The respondents will not be penalized for the conduct of members who do not act in concert or participation with them.

The United States Senate has made clear that it intended the courts to issue a temporary injunction in cases such as this in order to achieve "the public interest" in "the prompt elimination of the obstructions to the free flow of commerce." See Senate Report No. 105, 80th Cong., 1st Sess., page 8, see, also, page 27 (pp. 414 and 433 of Vol. 1, Legislative History of Labor Management Relations Act, 1947—U. S. Government Printing Office, 1948). Since this injunction only requires respondents to do what their executives have stated is their policy, it is "just and proper" (29 U.S.C.A. § 160(*l*) that it be issued in this case.[13]

The briefs of the parties (including the "Comments" of respondents) have been placed in the Clerk's file.

### Appendix

*Testimony of J. M. Griffin*

J. M. Griffin testified that six or seven times (N.T. 778) since January 1957, John Zorowichak (N.T. 90), a member of Local 107 in good standing except for the period of approximately March 1, 1959, to June 30, 1959, when he was suspended for delinquency in his dues, told Griffin that he was required to employ a union member to unload his truck at the A & P warehouse at Yeadon, Pa., and assigned

given, more than 2 days (from Wednesday afternoon until 10 A.M. Friday morning) to file their brief.

13. The trial judge's reserved rulings on evidence have been written on the notes of testimony filed with the Clerk. It is

noted that the granting of the motion to strike the testimony of V. McClintock (N. T. 103) was error in favor of respondents, since, as pointed out at N. T. 307, no statements were offered stating that anyone was acting for either respondent.

Local 107 members to do the unloading on these occasions:

A. On 1/3/57,[1] Paul Morris was assigned and gave a receipt on which was printed the Teamsters' emblem and the words "Highway Truck Drivers & Helpers, Local 107."

B. On 2/13/57, Louis Masana[2] was assigned and gave the same Local 107 form receipt.

C. On 3/24/59, Zorowichak unloaded the truck (N.T. 90–94, Exhibit P–2).

D. On May 23 or 24, 1959, Zorowichak unloaded the truck (N.T. 72–75).

Also, Mr. Griffin testified that in 1957 each person assigned by Zorowichak at the A & P Yeadon warehouse to unload trucks used printed Local 107 receipts on forms similar to those represented by Exhibits P–1A and P–1B referred to above.

*Testimony of L. W. Holsinger*

L. W. Holsinger testified that in the last six months he had driven his truck to the A & P warehouse in Yeadon three times (N.T. 118) and he had been required to use an unloader assigned by Zorowichak (N.T. 112–3). There was evidence that at least one of these unloaders was a union member and it can be inferred that this man was a member of Zorowichak's Local 107.[3]

*Testimony of J. L. Goller*

J. L. Goller has been required by Zorowichak to get an unloader at the A & P Yeadon warehouse since January 1957 and has seen him assign men to unload other trucks (N.T. 133–6). The unloaders so assigned wear a union badge on their clothes (N.T. 140). He produced receipts (P–3A and P–3B) showing that he paid Victor Parker (admittedly a Local 107 member) for unloading on December 8, 1958, and Arthur Johns for this work on March 9, 1959 (N.T. 136 ff.). Although the records of Local 107 do not show that Johns is a union member, the receipt (P–3B) indicates that he was a Local 107 member and he was doing the same unloading work other 107 members were doing under assignment by a 107 member.

*Testimony of J. W. Roe*

In June 1958, Zorowichak used the following language to J. W. Roe:[4] "You cannot unload your truck here. We are strictly union. You will have to pay a man or you don't unload" (N.T. 152). And Zorowichak unloaded the truck. Roe had the same experience in January 1959, but a different man than the man who prevented his doing the unloading in June 1958 required him to pay $19.60 for the unloading (N.T. 153).

*Testimony of M. Boppe*

In September 1956, two drivers of Charles W. Karper were required for the first time to employ unloaders at the A & P Yeadon warehouse (Exhibits P–6 and P–7). The receipts given by the unloaders to the above two drivers bore the printing "Highway Truck Drivers & Helpers Local 107."[5]

Mr. Boppe has also been required to employ unloaders at the Acme warehouse

---

1. The date on Exhibit P–1A should read "1/3/57," not "1/3/56" (N. T. 87–88).

2. Respondents never offered any testimony to negative the inference that this unloader was a Local 107 member which arises from use of this receipt. Cf. N. T. 335, where list of non-union members does not include this name.

3. N. T. 114–5. Although Local 107 stated that Curtis McNair was not a member, the man called McNair by Holsinger may have a different first or last name. Also, it is noted that the Regional Director is only required to have reasonable cause to believe that the charge is true and he is entitled to take into consideration that the Board is to make the ultimate decision and that it is not "required to observe the legal rules of evidence" and may admit "hearsay" evidence. See N. L. R. B. v. W. B. Jones Lumber Co., 9 Cir., 1957, 245 F.2d 388, 392.

4. Roe described the man giving him instructions as to "the procedures" as "a little blond-haired fellow" (N. T. 150–5), which is in accord with the description of Zorowichak by the other witnesses.

5. Respondents offered no testimony to show that the unloaders who signed these receipts with Local 107 printed on them were not members of the union. See footnote 2 above; cf. N. T. 335.

at 31st and Master Streets since September 1956 and testified that Al Trombetti (a member of Local 107) assigns the unloaders to trucks at that location (N.T. 248 ff.). Trombetti has helped to unload Karper trucks at this American Stores (Acme) warehouse on several occasions (N.T. 256). Mr. Boppe testified that two of Karper's trucks were required to be unloaded at the Acme warehouse by local men (one of whom was a member of Local 107 [6]) in December 1958, in accordance with the pattern which had been effective since the fall of 1956 (N.T. 252–6, Exhibits P–8A and P–8B).

Similarly, three of Karper's trucks were required to be unloaded by local men at this Acme warehouse on 2/10/59 (N.T. 258–9; Exhibits P–9A, P–9B, and P–9C).

## Order

This cause came on to be heard upon the verified petition of Bennet F. Schauffler, Regional Director of the Fourth Region of the National Labor Relations Board, for and on behalf of said Board, for a temporary injunction pursuant to § 10(*l*) of the National Labor Relations Act, as amended 29 U.S.C.A. § 160(*l*) (herein called the Act), pending the final disposition of the matters involved pending before said Board, and upon the issuance of an order to show cause why injunctive relief should not be granted as prayed for in said petition. The court has considered the pleadings, evidence, briefs, arguments of counsel and the entire record in this case and has made and filed its Findings of Fact and Conclusions of Law; and it appearing therefrom to the satisfaction of the court that there is reasonable cause to believe that respondents have engaged in, and are engaging in, acts and conduct in violation of § 8(b)(4)(D) of the Act, affecting commerce within the meaning of §§ 2(6) and (7) of the Act, 29 U.S.C.A. §§ 152(6, 7), 158(b) (4) (D), and that such acts and conduct will likely be repeated or continued unless enjoined,

Now, Therefore, upon the entire record, it is

Ordered, Adjudged and Decreed that, pending the final disposition of the matters pending before the National Labor Relations Board, respondents Highway Truck Drivers and Helpers, Local 107, International Brotherhood of Teamsters, Chauffeurs, Warehousemen & Helpers of America, and Warehouse Employees Union Local 169, International Brotherhood of Teamsters, Chauffeurs, Warehousemen & Helpers of America, their officers, representatives, agents, servants, employees, attorneys and all members and persons acting in concert or participation with them, be, and they hereby are, enjoined and restrained from engaging in or inducing or encouraging the employees of any employer to engage in a strike or concerted refusal in the course of their employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, materials, or commodities or to perform any services, where an object thereof is to force or require any trucker, who does not have a collective bargaining agreement with said Local 107, to assign the work of unloading his truck at places of delivery to employees who are members of or represented by respondent Highway Truck Drivers & Helpers, Local 107, International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, rather than to the trucker's or other employer's own employees, unless such assignment is covered by a collective bargaining agreement;

Also Ordered, Adjudged and Decreed that, pending the final disposition of the matters pending before the National Labor Relations Board, respondents Highway Truck Drivers and Helpers, Local 107, International Brotherhood of Teamsters, Chauffeurs, Warehousemen & Helpers of America, and Warehouse Employees Union Local 169, International Brotherhood of Teamsters, Chauffeurs, Warehousemen & Helpers of America, their officers, representatives and agents,

---

6. See Exhibit P–8A and N. T. 336.

by signing and transmitting the attached Notice to their members who work on the premises of or who are employees (including guards and receiving clerks) of,

The Great Atlantic & Pacific Tea Company at Yeadon, Pa.

American Stores Company at 31st and Master Streets, Philadelphia, Pa.

shall make clear that they are not inducing or encouraging any one to engage in any such strike or concerted refusal where an object thereof is to force or require any trucker, who does not have a collective bargaining agreement with said Local 107, to assign the work of unloading his truck at places of delivery to employees who are members of or represented by respondent Highway Truck Drivers & Helpers, Local 107, International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, rather than to the trucker's or other employer's own employees, unless such assignment is covered by a collective bargaining agreement.

### Notice

To all members of the following labor organizations:

Highway Truck Drivers & Helpers, Local 107, International Brotherhood of Teamsters, Chauffeurs, Warehousemen & Helpers of America.

Warehouse Employees Union Local 169, International Brotherhood of Teamsters, Chauffeurs, Warehousemen & Helpers of America.

To all employees of:

The Great Atlantic and Pacific Tea Company, at Yeadon, Pa.

American Stores Company at 31st and Master Streets, Philadelphia, Pennsylvania

Pursuant to an injunction issued by the United States District Court for the Eastern District of Pennsylvania in Civil Action No. 26700, we hereby give notice that:

Local 107 hereby reaffirms and restates that it has never had any policy whatever as to the proper persons to unload any outside trucks at these locations.

Local 169 hereby restates its policy that its members should handle any goods unloaded from over-the-road trucks, irrespective of who does the unloading, as stated in paragraph 44 of its agreement with the above employers, as follows:

"44. It is agreed that no dealer, farmer, trucker, seller, or supplier, not involved in a strike issue of his own, shall be intimidated, obstructed or interfered with by the Union or its members, without regard to Union or non-Union affiliations, in their normal and ordinary transaction of business with the Employer."

Highway Truck Drivers & Helpers, Local 107, International Brotherhood of Teamsters, Chauffeurs, Warehousemen & Helpers of America

By ―――――――――――――

Warehouse Employees Union Local 169, International Brotherhood of Teamsters, Chauffeurs, Warehousemen & Helpers of America

By ―――――――――――――